Argued March 20; affirmed April 8, 1941

# BERTSCHINGER *v.* NEW YORK LIFE INSURANCE CO.

(111 P. (2d) 1016)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND and ROSSMAN, Associate Justices.

*Roland Davis*, of Portland (Huntington, Wilson & Davis, of Portland, on the brief), for appellant.

*Earl F. Bernard*, of Portland (Collier, Collier & Bernard, of Portland, on the brief), for respondent.

LUSK, J. The defendant, New York Life Insurance Company, has appealed from a judgment in favor of the plaintiff in an action upon a policy of life insurance which provided for payment to the plaintiff, the beneficiary therein, of double the face of the policy in event of the death of the insured resulting directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause. The insured, the plaintiff's husband, came to his death by drowning while the policy was in effect. The company paid the plaintiff the face of the policy, $5,000, but refused to pay the additional sum of $5,000 for the reason that, as it claimed, the insured's death was caused by self-destruction and not by accident. A trial by a jury, in which that was the sole issue of fact, resulted in a verdict for the plaintiff.

The defendant has brought to this court five assignments of error which, however, raise substantially but two questions—the first relating to a ruling of the circuit court excluding certain testimony offered by the defendant, and the second based upon alleged errors in the instructions.

A brief statement of the pertinent facts becomes necessary.

The insured, Adolf Bertschinger, was a naturopathic physician residing in Portland. The policy was issued to him in September, 1922, and his wife, the plaintiff, was named beneficiary. On April 28, 1938, Bertschinger was convicted in the circuit court for Multnomah county on a charge of practicing medicine without a license, and on May 2nd was sentenced to imprisonment in the county jail for a term of six months and to pay a fine of $250, the judgment providing,

however, that upon payment of the fine he would be paroled to his attorney. He paid the fine and the provision for parole became operative. On May 16th Bertschinger left Portland on a trip down the Willamette valley for the dual purpose, as the plaintiff claimed, of fishing and soliciting financial aid from naturopathic physicians of Bertschinger's acquaintance in prosecuting an appeal to the supreme court from his judgment of conviction. He went first to Silverton and then to Mehama on the North Santiam river. He was last seen alive about a mile from Mehama, properly clothed and equipped for fishing, going in the direction of the river. The following morning a searching party found a fishing rod and a jar of salmon eggs, claimed to have belonged to Bertschinger, on the banks of the stream in the vicinity of the place where apparently he had gone to fish. His body was found in the river on June 5, 1938, about nine miles down-stream from Mehama.

The proof on the question of whether Dr. Bertschinger came to his death by accident or by suicide was of necessity entirely circumstantial. On the part of the plaintiff the effort was to show that he was not the character of man to take refuge from the difficulties of life in self-destruction, that his actions and demeanor on the last day that anyone saw him were those of a man looking forward to life rather than death, and, finally, that the conditions at the place where Bertschinger supposedly had been fishing—the steep and slippery river bank where the rod was found, the position and condition of the rod, and the swift current of the stream—all tended to make a case of accidental drowning. On the part of the defendant the contention, mainly, was that Bertschinger's con-

viction of practicing medicine without a license and other misconduct, presently to be mentioned, supplied the motive for suicide.

In support of this theory the defendant called as a witness Mr. T. B. Handley, deputy district attorney for Multnomah county, who had prosecuted the criminal case against Bertschinger, and offered to prove by him that at the time of passing sentence, Handley, in open court and in the presence of Bertschinger, had made the following statement to the court:

"If the Court please, I think it necessarily follows from this jury's verdict and from the evidence, while it is true that the indictment charges a surgical operation, the evidence showed and I believe the jury was convinced, that the surgical operation was an abortion or an attempt at an abortion. The facts surrounding it would indicate, taken in a private home, done secretly, and all of the evidence would be circumstances significant of the fact there was a tendency to use abortion, and this girl has positively testified an abortion was performed and a jury has found him guilty by ten to two when they necessarily had to take into consideration such an operation. And this defendant, I might say—I am so informed—has been a subject of complaint to the district attorney's office along this very line, and right at, within the last few days, another case in which he is represented to have taken part in the same kind of case, now pending, and the investigation of a case that has resulted in serious consequences leading to a fatality, and we regard him as one who has been engaged in the practice of performing abortions and we believe that this Court has established the fact that he has, and under the circumstances and conditions I am satisfied that he should not be temporized with in this case at all but that a severe penalty should be imposed, because this is a matter of a serious nature and something that must be stopped, and from the evidence in this case and the verdict of the jury and the other information we have, we believe that

this man has been indulging in this kind of practice, that should be stopped, and under the circumstances the State believes in a severe penalty being imposed, which can't be very severe under the charge of which he was found guilty. He was fortunate that he was only tried upon a misdemeanor, and the district attorney's office recommends a maximum sentence."

The plaintiff's objection to the foregoing offer of proof was sustained by the court. It is the defendant's position that the effect of the ruling was to exclude evidence tending to disclose Bertschinger's state of mind and a motive for suicide. To deal properly with this contention further reference to the record must be made.

It is in evidence that a great deal of the testimony in the trial of Dr. Bertschinger for practicing medicine without a license related to an alleged abortion.

While the defendant was not permitted to introduce the entire statement of Mr. Handley above quoted, it was permitted to prove by Handley that he stated to the court in Bertschinger's presence that at that time the district attorney's office was investigating a charge of abortion against Bertschinger, the case being a different one from that in which sentence was then being passed.

The attorney who represented Bertschinger in that case testified that several days after sentence was passed Bertschinger made the statement to him that "before he would go through a thing like that again he would rather jump in the river."

The defendant introduced evidence tending to show that on the 10th or 11th of May, 1938, Bertschinger performed an abortion on a young woman, who, after her operation, became desperately ill and was admitted to a hospital; that Bertschinger told a sister of the

young woman, after she was removed to the hospital, that "if it got out" "he would go to prison"; that she died in the hospital on the morning of May 14th; that before her death Dr. Arthur L. Canfield, a physician who was attending her, had a conversation with Bertschinger in which the latter asked whether the patient would recover, and Dr. Canfield said he did not think it was possible, whereupon Bertschinger asked if it would be a coroner's case and Dr. Canfield said that it would be; and that on the day of the young woman's death Dr. Canfield informed Bertschinger of that event and that he had reported the case to the coroner.

Two days later Dr. Bertschinger departed on the trip which ended in his death.

▮▮ Counsel for the defendant have cited a number of cases in which the rule is announced that, where suicide *vel non* is the issue and only circumstantial evidence is available, a wide latitude should be accorded the parties in the admission of evidence of facts and circumstances which may shed light upon the state of mind of the alleged suicide or establish a motive for self-destruction. With this doctrine we are in entire accord. The cases cited, however, only furnish illustrations of its application in varying states of fact, none of which present any clear analogy to the precise question in the instant case. More than one of these decisions recognize, what is commonly known, that where a person has committed a crime "the imminence of exposure, disgrace and peril" (*Kerr v. Modern Woodmen of America,* 117 Fed. 593) may be a motive for suicide, and that evidence bearing upon the subject is therefore admissible. That is the theory we take it, upon which the claim is asserted that error was committed in the exclusion of the deputy district attorney's statement.

Analyzing the statement, it divides itself into three main parts: First, that the evidence on the trial of Dr. Bertschinger for practicing medicine without a license showed that he was guilty of the crime of abortion; second, that the district attorney's office was then investigating another charge of abortion leading to a fatality, and regarded Bertschinger as one engaged in the practice of committing abortions; third, a recommendation that in the case then before the court the maximum sentence be imposed.

■ We may put to one side the first and the third parts of the statement. The substantive evidence in the record of the instant case showed without contradiction that much of the testimony in the Bertschinger trial had to do with an abortion, and this, of course, was known both to the deputy district attorney and to Bertschinger; while the recommendation for the imposition of the maximum sentence had necessarily spent its force after sentence was imposed and could no longer hold any terrors for the convicted man. See, *American National Insurance Company v. Anderson,* 42 Ga. App. 624, 157 S. E. 112.

As to the second part of the statement, the court admitted the substance of a portion of it and excluded the remainder. The witness Handley was permitted to testify that his office was then investigating a charge of abortion against Bertschinger, but he was not permitted to testify that it was an abortion eventuating in death. We should have thought that if part was competent then the whole would be, since the district attorney was merely describing the kind of a charge that was being investigated.

■ In view, however, of the command of the statute that a judgment shall only be reversed "for errors

substantially affecting the rights of the appellant" (§ 10-810, O. C. L. A.), we think that the question can be passed by without decision. If it be assumed that it was error to exclude Handley's statement that the abortion to which he referred led to a fatality, it could not have been prejudicial error in view of the evidence admitted. The jury were informed that Handley had threatened Bertschinger with prosecution on an abortion charge; that Bertschinger said, referring to his trial and sentence, that he would rather jump in the river than go through a thing like that again; that within nine days thereafter Bertschinger did commit an abortion, followed by the death of a young woman; that he was conscious that he would go to prison if the crime was discovered; and that Bertschinger knew that the case had been reported to the coroner and had every reason to believe that his crime was discovered.

Manifestly, if fear of discovery of crime, knowledge, indeed, that crime has been unearthed, with consequent disgrace and punishment, may be considered a motive for suicide, such a motive was established by the evidence in this case. Its existence was uncontradicted and inescapable, but, of course, not conclusive of the issue. On the contrary, it constituted but one link in the chain of circumstances. The decision of the ultimate question was for the jury, as the defendant concedes, and countervailing evidence pointing in some measure to accidental death must have weighed more heavily with that tribunal and controlled its verdict.

In this view, and for the foregoing reasons, we are of the opinion that no substantial right of the defendant was affected and no reversible error committed by the court's ruling which excluded from the testimony

either the entire statement of the deputy district attorney, or his accusation that the abortion concerning which he was permitted to testify, led to a fatality.

The court instructed the jury as follows:

"The term 'accidental' as used in the policy involved in this case is used in its ordinary popular sense and means 'happening by chance,' 'unexpectedly taking place,' 'not according to the usual course of things' or 'not as expected.' You are instructed that death from drowning is a bodily injury effected through external and violent causes and the question therefore for you to determine in this case is whether the death of Adolf Bertschinger was accidental as alleged by the plaintiff or suicide as alleged by the defendant."

"It is not necessary in order for the plaintiff to recover that she exclude all possibility of Adolf Bertschinger's having committed suicide. In the event that the plaintiff has proved to you by a preponderance or greater weight of evidence that the death of Adolf Bertschinger was accidental then your verdict must be for the plaintiff."

The court refused to give the following instruction requested by the defendant:

"Accidental cause as used in the policy involved in this case means that something unexpected, unusual or unforeseen occurred which caused the death of the insured."

Exceptions taken by the defendant to the instructions given as above set out, and to the refusal of the court to instruct as requested, constitute the basis of assignments of error (3), (4) and (5), and are all to the point that the court failed to advise the jury of the distinction between death resulting from accidental cause and death which is itself an accidental result, and instead confused the two by speaking of accidental death. The policy, it is argued, does not provide for

payment of double indemnity in case of accidental death, but only in case of death "resulting directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause".

■ This court is committed to the doctrine that in an action on a policy of insurance, containing such a provision, it will not suffice to show that death was an unexpected effect, but it is essential to a recovery that the cause of death was itself accidental. *Kendall v. Travelers' Protective Association*, 87 Or. 179, 190, 169 P. 751. The same rule applies to claims under the Workmen's Compensation Act. *Dondeneau v. State Industrial Accident Commission*, 119 Or. 357, 249 P. 820, 50 A. L. R. 1129. The distinction is well illustrated in the Kendall case, which was an action to recover upon an accident policy. The plaintiff claimed that a barber, in endeavoring to remove some ingrowing hairs on his chin, penetrated or broke the skin, thereby causing an open wound into which an infection was introduced. It was held that if the barber, in order to perform the operation, intentionally made the cut which afterwards became infected, the injury was not caused by "accidental means" within the terms of the policy, although the injury may itself have been accidental. If, however, as the plaintiff asserted, the cut was made accidentally, not intentionally, that would be an "accidental means" causing the injury.

■ In a case of that kind it would be important for the court to make this distinction clear in the instructions, and ground for a new trial should it fail to do so. But under the facts of the instant case it is impossible to see how the court's failure to explain more precisely, or to elaborate upon, the difference between accidental

cause and accidental death could have led to any misunderstanding or confusion on the part of the jury. It is conceded that Bertschinger met his death by drowning. The sole issue was whether it was drowning by accident or by design—suicide. If the latter, the plaintiff was precluded from recovery. But if it was not suicide then it was not intended, and that would be death by accidental cause. Whether the plaintiff slipped upon the rocks on the precipitous bank, or waded unintentionally beyond his depth, or lost his balance upon a rock in midstream, or however his death might have occurred, if he did not intend to drown himself then he was drowned accidentally and as the result of an accidental cause.

Under the issue as thus presented we think the instructions of the court sufficed for the practical purposes of the case. The trial judge informed the jury of the pertinent language of the policy and that the plaintiff alleged in his complaint "that the insured's death resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause". He charged that the plaintiff had the burden of proving that the insured's death resulted "from bodily injury effected solely through external, violent and accidental cause", and that if the jury were in doubt whether death resulted from self-destruction or "bodily injury effected solely through external, violent and accidental cause" their verdict must be for the defendant; and followed this instruction by correctly defining the word "accidental". He then properly told the jury that death from drowning is a bodily injury effected through external and violent cause and submitted to them the question "whether the death of Adolf Bertschinger was

accidental, as alleged by the plaintiff, or suicide, as alleged by the defendant''. Thus, it will be seen that the court no less than four times instructed the jury that the plaintiff, in order to recover, must prove death from bodily injury effected by accidental cause. The use of the phrase ''accidental death'' in the setting of this case and in view of the instructions given cannot be criticized as even technically inaccurate, because death caused by accidental means is an accidental death, although accidental death may not be the result of accidental means. 5 Couch on Insurance 3973, § 1137. A decision reversing the judgment and ordering a new trial on account of the alleged errors in instructions might be a triumph for mere legal formalism, but it would not conform to the spirit of our Code nor reflect credit on the judicial process.

■ The parties stipulated that the trial judge might fix the plaintiff's attorney's fees, and he accordingly made an award of $1,000. The plaintiff has asked further fees in this court, under § 101-134, O. C. L. A. The defendant says that the plaintiff has already been awarded enough for the services of its attorneys in both courts. We are almost inclined to agree. The allowance made below is so large and generous as to suggest that it is the circuit judge's expression of admiration for the skill of plaintiff's attorneys in winning a verdict in a case where much of the evidence was against them. However, this may be, the plaintiff is entitled to attorneys' fees here by force of the statute. Under the circumstances, we allow $50.

The judgment is affirmed.