Argued November 21, 1960, affirmed February 21, 1961

# THOMPSON *v.* GENERAL INSURANCE COM-
# PANY OF AMERICA

359 P. 2d 1097

*James A. Cox,* Ontario, argued the cause for appellant. With him on the brief were Yturri & O'Kief, Ontario.

*David C. Silven,* Baker, argued the cause for respondent. On the brief were Banta, Silven, Horton & Young, Baker.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and KING, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Joseph R. Thompson, from a judgment notwithstanding the verdict, which the circuit court entered in favor of the defendant General Insurance Company of America upon the latter's motion. The plaintiff was an employee of a partnership known as Wendt Bros. which was engaged in ranching operations and which was

the insured in a policy issued by the defendant's predecessor. The policy provided that the insurance company would pay the amount designated in it to any employee of Wendt Bros. who sustained bodily injury or sickness "caused by accident" and arising out of and in the course of his employment. The defendant and its predecessor have merged and the defendant has assumed all of the contractual duties of its predecessor.

Tuesday morning, June 25, 1957, the plaintiff, as an employee of Wendt Bros., endeavored to break a horse to harness. The work required vigorous effort. At 11:30 that morning, after the work had continued for about one and one-half hours, the plaintiff discontinued it, unharnessed the horse, returned him to the barn and then ate his noonday meal. About an hour later he experienced pains in his chest and shortness of breath. Presently he was taken to a physician who subsequently diagnosed his condition as a coronary thrombosis resulting in heart muscle degeneration, that is, weakening. The plaintiff's (appellant's) brief speaks of his condition as "a coronary thrombosis resulting in a myocardial infarction." Neither his physician nor any other witness employed the term "a myocardial infarction." The plaintiff contends that his illness resulted from an accident within the contemplation of the policy which provides that the defendant will:

> "* * * pay to or for each person described below who sustains bodily injury, sickness, or disease, caused by accident, the reasonable expense incurred within one year from the date of accident for necessary medical, dental, surgical, ambulance, hospital, professional nursing and funeral services:

"(a) (Employees) each employee of the named insured as to any accident arising out of and in the course of his or her employment during the prosecution of farming or ranching operations * * * *."

■ The main issue is whether the record discloses that the physical disability of which the plaintiff complains resulted from an accident within the purview of the provision just quoted. The defendant stipulated that if the plaintiff is entitled to recovery he may have judgment for the maximum amount provided by the policy—$1,000.

The trial judge granted judgment to the defendant notwithstanding the verdict because of a belief that the record contained no evidence revealing an accidental cause for the plaintiff's illness.

The first assignment of error reads:

"The Court erred in granting defendant's motion for judgment notwithstanding the verdict and in entering a judgment for the defendant."

The appellant's (plaintiff's) brief, referring to that assignment of error, acknowledges that the principal question in the case is whether the plaintiff sustained the coronary thrombosis as the result of an accident which befell him while he was in the employ of Wendt Bros. The defendant does not challenge the evidence which indicates that the plaintiff suffered a coronary thrombosis, but argues that the record is devoid of proof indicating that an accident occurred to the plaintiff.

Dr. Fletcher Campbell, the physician who treated the plaintiff, testified that medical science recognizes that physical exertion may produce a coronary thrombosis. He explained:

"* * * Now, under the effective exertion, particularly a combination of heavy physical exertion, plus emotional tension, the blood-pressure immediately goes up, the heart rate becomes more forceful as the blood-pressure goes up, and one of these small blood-vessels ruptures and breaks, and it causes the lining of this main blood-vessel to be indented thusly. A big blood-clot forms underneath there. * * *"

He added, "there is no doubt at all but what the events of the few hours preceding my seeing him caused the coronary thrombosis." No other physician testified.

We will now take note of the events that occurred while the plaintiff was attempting to break the horse to harness.

The plaintiff, 62 years of age, had worked upon ranches since he was 15 years old. As a boy he had seen his father and uncle break horses. He estimated that he himself had "broken close to a couple hundred" horses and deemed that he was familiar with the methods used in that line of endeavor. His normal employment consisted in working about horses, but during the haying season he had entered the employment of Wendt Bros. and incidental thereto agreed to break to harness two of their horses. One of the two was black in color and weighed 1500 to 1600 pounds. The other was a sorrel horse and weighed 1960 pounds. Both were six years of age and both had been "broken to lead," that is, they could be led by a halter. The plaintiff found them more gentle than he had expected. According to him, those who break a horse hitch him to a wagon along side of a well broken horse because the latter "will mind and hold the other horse." In the instance in question a wagon was obtained from a neighbor by the name of

Fred Widman who also loaned to the Wendt Bros. for the occasion in question a broken horse about 12 or 13 years of age which weighed 1550 to 1600 pounds. Its name was Snip. Mr. Widman testified that Snip had helped to break several other horses.

On a Monday morning the plaintiff hitched the black horse, which he was hired to break, to the wagon and also Widman's broken horse (Snip). He then drove the team thus hitched many times around a pasture nine or ten acres in extent which was owned by the Wendts. Nothing untoward happened. At the end of those efforts the plaintiff unharnessed the team and after placing the harness upon the sorrel horse undertook to hitch it to the wagon. According to him, the sorrel horse was "a snappy horse with a lot of action." Presently he made a lunge, broke the wagon's tongue, and the efforts were brought to a close for the day. The next morning, being Tuesday morning, the plaintiff again placed harness upon Widman's black horse, Snip, and then upon the sorrel horse. He next hitched them to the wagon. Mr. Widman assisted and after the horses had been hitched seated himself in the wagon beside the plaintiff. A 16 year old boy by the name of Roger Thompson also entered the wagon; then the team was started around the pasture. The pasture, the wagon and the broken horse were the same that had been used on Monday. According to the plaintiff, the sorrel horse "was not a usual horse to me." He added, "They wouldn't run as long as he did. * * * I never did break a horse as large as this horse before that had the action." After they had circled the pasture for about a half hour, starting and stopping intermittently, Mr. Widman left; thereupon a friend of the plaintiff, Chuck Searles, came to the pasture

and took the seat that Widman vacated. By this time, so the plaintiff swore, the action of the sorrel horse had frightened Widman's horse and command over the two became more difficult. He thought that the broken horse (Snip) was not holding the unbroken one sufficiently in check. The plaintiff testified that he was compelled to pull upon the reins with all his strength in order to control the team. He stated that the horses would run for three or four minutes, stop for five to ten minutes and then run again. Steering the team, so that it would not collide with obstructions in the pasture, such as a fence and a chicken house, was difficult; however, it was successfully performed. The plaintiff acknowledged that the horses did not escape from his control. The wagon did not tip over and neither he nor either of the other two occupants fell from it. At 11:30 a.m. the efforts were discontinued, the plaintiff removed the harness from the horses and placed the team in the barn.

The plaintiff acknowledged that breaking a horse to harness always requires tugging and pulling on the reins. He explained that the amount of tugging and pulling "depends on the horse." He added that no two horses are "hardly alike." Continuing, he declared that in breaking a horse "there is quite a little excitement."

We also take the following from plaintiff's testimony:

"Q When you break a horse to harness, you known if you want to stop the horse you have got to pull on the lines until he stops?

"A Yes. You can't stop an unbroke horse by pulling on the lines. That's why you need a good broke horse that will mind and stop.

"Q And you know you are going to have to brace yourself whenever you are breaking horses to harness, don't you?

"A What do you mean, 'brace yourself'?

"Q Well, first you brace yourself so you won't fall off.

"A Oh yes, sure.

"Q Or be bounced off.

"A Yes.

"Q If you are going to drive, you have got to pull on the lines and hang on.

"A Yes.

\*     \*     \*

"Q About the only difference is that one horse might run longer than the next one, isn't that about it?

"A That's right. One might take longer. One might be harder to hook up.

"Q But the big difference is, if there is any difference at all, one horse might run a little longer than the next one, isn't that right?

"A Yes, they can.

"Q Isn't it a fact, the only thing that happened to you out there that day that you did not expect was that you got sick?

"A That I what?

"Q The only thing that happened to you that day that you didn't expect was that you got sick?

"A Well, there was quite a lot of things happened. The horse run a lot longer than I expected and a lot faster. They was a lot harder to steer to keep them from getting away than I expected. That's why I had the heart attack.

"Q Referring now to page 44 of the deposition. You will recall that I asked you at the time of taking your deposition, Joe, 'Was there any-

thing happened that you didn't really expect to happen? A Yes. Q What? A Getting sick. I didn't expect that to happen.' Do you remember those questions and that answer?

"A I do.

"Q And my next question, 'Other than that, though, you kind of expected all the rest of it, didn't you? You realized that was a fractious horse, didn't you? A Yes, but he was more fractious than any I had handled for some time.'

"A Yes.

"Q You remember those questions and those answers?

"A Yes.

"Q And they are still correct, aren't they, Joe?
"A Yes."

The plaintiff testified that he had never before undergone medical treatment for anything pertaining to his heart, but said that some years previously "I was operated on for appendicitis," that in 1952 he had undergone surgery "for prostrate [sic] trouble," and that in 1953 "I had pneumonia."

The incidents that happened in the above manner three or four hours before the plaintiff was taken to Doctor Campbell's office will have to determine whether (1) the jury had support for its verdict that the coronary thrombosis came upon the plaintiff by means of an accident, or (2) the trial judge correctly found that the evidence did not indicate that any accident had occurred. When the trial judge made his ruling he declared:

"It is obvious from the pleadings that it was necessary for the plaintiff to establish that the injury was the result of accidental means.

\* \* \*

"The real issue is whether or not there was

sufficient evidence in the record to show that the coronary thrombosis suffered by the plaintiff was caused by an accident."

The policy issued by the defendants did not offer protection to an employee of Wendt Bros. who became the victim of ill health unless the ill health was "caused by accident." According to 29A Am Jur, Insurance, § 1164, page 308:

"* * * the words 'accident' and 'accidental' have never acquired any particular significance in law and when used in an insurance contract, are to be construed and considered according to the ordinary understanding and common usage and speech of people generally."

The treatise continues: "The definitions of these words in insurance cases have been many and varied in form."

■ We deem that it is our duty in this case to do as we have done in prior cases, that is, to assign to the word "accident" its common meaning—the one which a purchaser of a policy of accident insurance places upon the word "accident" when he buys a policy.

Immediately before the plaintiff became the victim of the ailment which we have described he was engaged in work which required, as he well knew before he undertook it, skill, considerable physical exertion and the ability to cope with excitement. The skill and might to control a young unbroken horse, weighing almost one ton, was a feat for the hardy. The plaintiff had passed his 62nd birthday and was, therefore, no longer a young man. The passing years had brought him to a doctor's office more than once and to the surgery of a hospital twice. Then came the juncture of events which yielded this law suit. If the plaintiff, instead of attempting to break in the

sorrel horse upon that unfortunate morning, had taken a long walk or a swim and at its close had experienced the ill effects which brought him to Doctor Campbell's office, we do not believe that he would have said that he had undergone an accident. Very likely he would not have used the word "accident" at all in describing his trouble. In narrating from the witness stand his difficulties in handling the horses on the morning of June 25 he did not resort to the word "accident." Although Doctor Campbell expressed a belief that the exertions which the plaintiff underwent in breaking in the sorrel horse subjected his coronary arteries to an undue strain and thus brought on the coronary thrombosis, he did not indicate that any accident had taken place. To the contrary, his testimony denotes that nature took its inexorable course.

This court, like many others, has held that the word "accident" denotes an incident or occurrence that happened by chance, without design, and contrary to intention and expectation. Its advent was unforeseen. Obviously, an event which was planned and which came about as planned can not be deemed an accident. One of our more recent expressions upon the subject is the following in *Kehoe v. Industrial Accident Commission*, 214 Or 629, 332 P2d 91, by Mr. Justice PERRY:

> "This Court is committed to the rule that when an unusual or unexplained result occurs by reason of the doing of an intentional act, where no mischance or slip occurs in the doing of that act, the injury is not an accident within the meaning of the statute. *Burrows v. State Ind. Acc. Com.*, 209 Or 352, 357, 306 P2d 395.
>
> "It is not the doing of an intentional act, however, that is controlling; it is what occurs while

doing the intentional act. Practically stated, the cause of injury itself must be accidental not the unforeseen result.

"It is clear from the following citations that if, in the doing of an intentional act, a workman is injured by an unexpected occurrence which causes an external force to be directed against the person, an accident occurs within the meaning of that term as used in the statute. *Elford v. State Ind. Acc. Com.*, 141 Or 284, 17 P2d 568; *Huntley v. Ore. St. Ind. Acc. Com.*, 138 Or 184, 6 P2d 209; *Dondeneau v. State Industrial Acc. Com.*, 119 Or 357, 249 P 820, 50 ALR 1129."

It will be observed that the plaintiff's work in breaking in the sorrel horse was planned and intentional. Before he began it he had become familiar on the preceding day (Monday) with the wagon, with the pasture and with the broken-in horse, "Snip." In fact, he had even become somewhat acquainted with the sorrel horse itself when the latter lunged (on Monday) and broke the wagon tongue.

In *Buckles, Executor v. Continental Casualty Company*, 197 Or 128, 251 P2d 476, 252 P2d 184, the court said:

"This court is committed to the rule set forth in *Caldwell v. Travelers Insurance Co.*, 305 Mo 619, 267 SW 907, 39 ALR 56, as follows:

" 'Where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen.'

\* \* \*

"In *Bertschinger v. N. Y. Life Ins. Co.*, supra,

at page 317, Mr. Justice Lusk, speaking for the court, said:

" 'This court is committed to the doctrine that in an action on a policy of insurance, containing such a provision, it will not suffice to show that death was an unexpected effect, but it is essential to a recovery that the cause of death was itself accidental. Kendall v. Travelers' Protective Association, 87 Or. 179, 190, 169 P. 751. The same rule applies to claims under the Workmen's Compensation Act.' "

*Hutchison v. Aetna Life Insurance Company,* 182 Or 639, 189 P2d 586, states:

"We shall not undertake to suggest the cause of this injury. It should, however, be noted that there is no evidence that any injury which the deceased may have sustained from jumping was caused through accidental means. If the jumping was intentional and no mischance, slip, or mishap occurred during the act, the injury resulting therefrom, if any, would not have been caused through accidental means. *Seater v. Penn Mutual Life Ins. Co.,* supra; *Bertschinger v. New York Life Ins. Co.,* 166 Or. 307, 111 P.(2d) 1016; *Kendall v. Travelers' Protective Ass'n,* 87 Or. 179, 169 P. 751. There is no evidence, and no claim is made, that Hutchison had an accident after November 28th.

"The fact that Hutchison's death followed an injury is not proof that death resulted therefrom. 'The connection between the two must be proven with reasonable certainty.' *Spicer v. Benefit Ass'n of Ry. Employees,* 142 Or. 574, 17 P.(2d) 1107; 21 P.(2d) 187, 90 A.L.R. 517."

The holdings of this court in the foregoing decisions—and others that we have left uncited—that the injury itself must be the product of an accident stem from *Kendall v. Travelers' Protective Association,* 87 Or 179, 169 P 751, in which the plaintiff

sought recovery upon a policy of fraternal insurance which promised payment for injuries received "through external, violent and accidental means." The plaintiff in that case asked his barber to remove from his chin an ingrowing hair. The barber made the requested incision and later an infection occurred which was the basis of the plaintiff's demand for recovery upon the policy. This court, in affirming an order of the circuit court granting a new trial to the defendant, declared:

> "We note that the defendant does not insure merely against injuries although they might constitute an unexpected effect. The damage, whether anticipated or not as a result, must have happened through accidental, violent and external means. * * * In other words, under such a policy as this the liability must be determined by causes rather than consequences."

Since the wound was made intentionally and pursuant to the plaintiff's request, the plaintiff was not deemed the victim of an accident even though the infection that caused him to suffer illness was something that he had not anticipated and certainly had not sought.

An annotation in 7 ALR 1131 at 1136 digests many decisions which denied recovery on account of death or injury resulting from the insured's exertion in the performance of a voluntary act. They held that it is not enough that the death or injury be unexpected and demanded that the cause itself be unexpected and unusual.

The statements by this court which we just quoted are adverse to the plaintiff's contention that his illness resulted from an accident, but the plaintiff claims that the facts in *Kehoe v. State Industrial*

*Accident Commission,* supra, are similar to those in this case. Our decision in the Kehoe case affirmed a judgment for the plaintiff. In that case the plaintiff, as an employe of the lumber manufacturer, operated a fork lift truck which had a defective steering mechanism. According to the decision, "the steering wheel would suddenly stop and kick back, jarring and jolting the plaintiff." From the shaking which the plaintiff underwent in that manner he incurred a myocardial infarction. In other words, in that case something happened which was an accident, that is, the steering wheel developed a defect which caused the plaintiff to be subjected to severe jolting and jarring. That was something which was unexpected. The development of the defect was an accident. In the present case we know of nothing which can be deemed unexpected. The plaintiff argues that we should deem that the broken horse in the case at bar failed to perform as would normally be expected and that therefore the plaintiff was required to undergo extra strain. We believe, however, that the record indicates that the plaintiff's experience with the broken horse was only one of the difficulties with which an individual engaged in the plaintiff's calling is required to contend.

The plaintiff calls our attention to the fact that Oregon Laws 1959, chapter 448, § 1, which is now ORS 656.002 (19), in amending our workmen's compensation act (ORS 656.002 through 656.990), re-defined the meaning of the term accident by enacting:

"An injury is accidental if the result is an accident, whether or not due to accidental means."

This amendment was enacted, as we just mentioned, in 1959. The policy of insurance upon which this case

is based was written prior to June 25, 1957. We observe that ORS 203.124 also gives a statutory definition of the term "accidental injuries." The act of 1959, as we have noted, is concerned with injuries upon which relief is sought under the workmen's compensation act. ORS 203.124 is concerned with injuries for which relief is sought from a county governing body. It reads:

> " 'Accidental injuries' means injuries sustained as the direct result of accident not caused by his own negligence, by a county employee while engaged in the performance of his official duties."

We do not believe that the amendatory act of 1959 is applicable to this case.

Without resort to further analysis we express our belief that the evidence fails to show that the plaintiff's unfortunate condition resulted from an accident. It affords no basis for a finding that the plaintiff was the victim of an accident—that is, of a mishap, slip-up or misadventure. To the contrary, it indicates that events pursued their normal course, even though the sorrel horse made them rough, turbulent and exciting. The plaintiff found himself engaged in an undertaking to which his spirit was willing but his heart unequal.

The defendant had a right to limit its liability in any manner that it saw fit. It limited it to illnesses and injuries resulting from accidents. The plaintiff, notwithstanding the ingenuity of his skillful counsel, has been unable to meet that condition.

The circuit court did not err in entering judgment for the defendant. The judgment is affirmed.