Argued October 2, reargued December 6, reversed in part;
affirmed in part December 31, 1963

# FINLEY *v.* PRUDENTIAL LIFE & CASUALTY INSURANCE COMPANY

388 P. 2d 21

*John H. Horn,* Roseburg, argued the cause for appellant. With him on the brief were Horn & Slocum, Roseburg.

*Eldon F. Caley,* Roseburg, argued the cause for respondent. With him on the brief were Long, Neuner, Dole & Caley, Roseburg.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Venice W. Finley, from a judgment of the Circuit Court which dismissed her complaint. The trial was without a jury.

Plaintiff is the widow of Jack V. Finley who died in Lakeview Hospital, Lakeview, Oregon, January 25, 1962. She instituted this action to recover under a "Hospitalization Sickness or Accidents Policy" issued by defendant to her husband as the insured. It named the plaintiff as beneficiary. The complaint alleges two causes of action under different provisions of the

policy. The portions of the policy material to her cause of action are:

"Part One

The Insuring Clause

"This policy insures, subject to all provisions and limitations herein contained against loss:

"(a) Resulting from accidental bodily injury sustained while this policy is in force, hereinafter referred to as 'such injury.'

\*     \*     \*

"Part Two

Hospital Confinement Benefits

"a.   Adults.  If the insured or any adult member of the family shall be necessarily confined to a hospital as a result of 'such injury' for which benefits are payable  \*   \*   \*   the Company will pay for each and every day of such confinement, beginning with the first full day of such confinement, at the rate of One Hundred Dollars ($100.00) a week not to exceed fifty-two (52) weeks.

\*     \*     \*

"Part Three

Accidental Death Benefits

"If any member of the family, while this policy is in force, shall sustain such accidental bodily injury while driving or riding within any automobile, truck or bus and such injury resulting from the damaging of said conveyance shall directly and independently of all other causes, within 60 days result in death of such member of the family, the Company will pay the sum of Five Thousand Dollars ($5,000.00).  'Automobile, truck or bus' as used herein does not include a tractor, farm machinery, motorcycle or any type of vehicle not commonly operated on public highways."

The parties stipulated to most of the facts; those outside the stipulation are substantially undisputed. The defendant presented no evidence.

The stipulated facts were presented to the circuit court by defendant's counsel. He began their recital in this manner:

"Our stipulation is, your Honor, that plaintiff would have evidence to this effect, and that we would have no contradicting evidence as to matters that I will now read &ast; &ast; &ast;."

We will now state facts that usher in the vital issue and will then resort to the stipulation.

The insured, Jack V. Finley, left Roseburg Thursday, January 18, 1962, in a motor truck for northern Nevada to pick up a caterpillar tractor. He was 56 years old and was accompanied by one Bob Flury, 19 years of age. Flury owned and drove the truck in which the two men rode. They found snow on the pavement before they reached Lakeview, but when they came to an area about 32 miles east of Adel, Oregon, which lies near the Nevada border, they encountered very low temperatures, a snow storm, and snow that drifted into embankments. We will now resort to the stipulation. It states that after the two men left Roseburg they "proceeded without incident until they came upon a dirt slide partly blocking the road about 32 miles east of the community of Adel in Lake County, Oregon." Since the "slide" is important, we interrupt the quotation for the purpose of noting that Flury explained that there actually was no dirt in the slide. He stated that the formation was called "a dirt slide" on account of the precipitous embankments through which the road passed. However, the snow at that place, its depth, the drifts, and the grade rendered it impossible for the truck to proceed. The stipulation continued:

"&ast; &ast; &ast; the slide was encountered late at

night on the 18th of January; that because of the precipitous nature of the bank, the snow and the difficulty in seeing to turn around or back up, they decided to sit in the cab of the truck until morning, at which time they turned the truck around and headed back towards Adel and Lakeview, Oregon; that during the night the storm had continued and snow had drifted across the road so as to prevent the truck's negotiating a grade on the way back to Lakeview; that they again turned around and headed in an easterly direction in an attempt to negotiate the slide area; that they were unsuccessful on the second attempt to negotiate the slide area and decided to return to a point several miles westerly of the slide area to obtain shelter in a road construction cabin they had noticed earlier; that on the way back to the cabin the snow had drifted across the road and caused the truck to become completely stalled in the snow; that the insured was not strong physically, the snow was deep, the altitude high, and the weather very cold, and it was decided to await rescue in the truck; that on the night of January 20th, the temperature dropped to an extreme low of about 55 degrees below zero, and at about 10:00 o'clock p.m. the radiator on the truck froze up while the engine was running; that the engine and heater of the truck would no longer operate because of the frozen condition  *  *  *."

It thus appears that the two men and their truck were in a lower area from which they could not escape. Both to the east (slide area) and to the west of them (Adel) lay higher ground, but their truck could not move up the snow covered grades in order to reach either of those areas.

We pause to observe, by way of resume, that on the night of Thursday, January 18, the slide area had rendered it impossible to drive the truck any further east. Likewise, on that evening the men could not turn

the truck around. Accordingly, the two stayed all night in the truck's cab with the motor running. The next morning, Friday, January 19, Flury succeeded in turning the truck around and thereupon headed it westward for Adel, but when he came upon an adverse grade snow rendered it impossible for him to proceed further west. He then turned around and again drove eastward toward the slide area. Again the snow rendered it impossible for his truck to proceed up the grade. Once more he turned the truck around and this time headed for the construction cabin that the two men had seen. They hoped to enter it and there escape from the severe cold until a rescue party by chance would find them. When they had reached a place about one and one-half miles from the cabin the truck became completely stalled by the snow. According to the testimony which was given by Flury and which is both unchallenged and uncontradicted, the two men decided, upon that crisis, to remain in the truck, keep the motor running, and await rescue.

Before long the misfortunes of the two men took a severe turn for the worse. The new misfortunes compelled the two men to abandon quickly their present plans and seek nothing less important than the saving of their lives—if possible. The new juncture of events to which we just referred was the freezing of the truck's radiator and the disablement of its motor. The truck had ample fuel and the supply of the latter had no bearing upon the motor's cessation of operation. The hour when these disasters struck was 10:30 Saturday night. The temperature was about 54 degrees below zero. After those events occurred the truck provided no more warmth. It could no longer be occupied as a place of shelter, and as a means of transportation it was useless. The men were upon

their own. The breakdown of the truck withdrew all help from them. They were in a vast uninhabited area, and assistance would come to them only in the event a rescue party was organized.

Flury, who gave testimony that is uncontradicted, swore that he noticed that after the heater stopped operation the temperature in the truck's cab dropped materially and that the precipitation on the window froze. He added, "In fact, I started to go to sleep." At that point the two men decided that they must abandon the truck and make their way, if possible, to the cabin which was a mile and a half in the distance. The snow on the ground lay to a depth of eighteen inches. The temperature was unbelievably low. After the men had taken only a few steps, Mr. Finley was unable to proceed. Thereupon Flury put him upon his shoulders and started for the cabin. It took him two hours to make the journey. Finley was semi-conscious when they reached the cabin.

The record warrants a belief that Finley had never contemplated that he would be cast into this area for an indefinite stay subject to intense cold and bereft of food, warmth, shelter, and transportation. Nor had he any premonition that he would find himself in a situation in which his life would be dependent upon the mercy of some rescue party. Since he had daily gone about his business, he had never thought that the depth of snow on the road and the arctic cold would render it necessary for a young man to carry him upon his back for one and one-half miles so that he could reach a cabin or otherwise freeze to death. All of these life-threatening disasters came upon the insured when the truck became disabled.

Flury found that the cabin contained no fuel, and he was compelled to pull material from the walls in

order to obtain fuel. The two men spent Saturday night, Sunday, and Monday until 4:00 p.m. in the cabin. At that hour they were rescued by a highway disaster truck. The two men had had nothing to eat from Thursday until after their rescue. Shortly after they reached the cabin, blisters began to form on Finley's hands and the latter hurt him. He had no feeling in his feet. Immediately after their rescue the two men were taken to the Lakeview Hospital where Flury was treated for minor frost-bite and released. Finley was given a thorough examination. The examining physician, Dr. Paul Kliewer, in response to written interrogatories, stated that Finley was suffering from severe frost-bite and that twenty-four to thirty-six hours after admission to the hospital he contracted acute broncho-pneumonia. He died in the evening of January 25, 1962.

The insured had a medical history of lung trouble. In 1956 he had half of one lung surgically removed. He had asthma, emphysema, bronchiectasis, and chronic bronchitis. Mrs. Finley (appellant) testified he carried an oxygen tank and mask with him to use when he had difficulty breathing.

Dr. Paul Kliewer responded to this written interrogatory which was read into the record:

"Q Assuming that Mr. Finley's physical condition prior to his exposure made him more susceptible to injury and death from the exposure, can you state, within the realm of reasonable medical probability that none of these pre-existing conditions, acting by themselves individually or collectively, without stimulation by the exposure, caused or tended to cause the death of Mr. Finley?

"A Mr. Finley's death was due to acute broncho-pneumonia which was caused by exposure ag-

gravating the pre-existing lung condition which he had prior to the time of admission."

The death certificate listed the immediate cause of death as "exposure" and noted acute broncho-pneumonia, emphysema, and chronic bronchitis as contributing causes of death.

■ The defendant (respondent) contends that Mrs. Finley lost her right to appeal through failing to object to the trial court's findings of fact. The defendant's contention fails on the authority of *Ewauna Box Co. v. Weyerhaeuser Timber Co.,* 198 Or 360, 255 P2d 121, which said:

"* * * where an action is tried to the court without a jury, the question of the failure of the court to make *findings of fact* believed proper by the appealing party, or the sufficiency of the evidence to support the *findings of fact* made by the court, must, in each instance, by proper proceedings be first brought to the attention of that court before they will be considered on appeal.

"The above rule of law does not apply to the matter before us as the facts are not controverted by the parties; no findings of fact were or are required but only the application of law to the admitted facts. * * *"

This case, like the *Ewauna Box Co.* case, requires only an application of law to the submitted facts.

Plaintiff's first assignment of error challenges the order which dismissed her first cause of action. The latter is for the recovery of hospitalization benefits under Part Two of the policy which is set forth in the second paragraph of this opinion. This provision of the policy affords benefits to the insured for necessary confinement in a hospital for "such injury." Not

every confinement in a hospital is compensable—only confinement as a result of "such injury." The term, "such injury," is defined in Part One of the policy as "accidental bodily injury."

■ Whether an insured has suffered "accidental bodily injury," is ordinarily a fact question for the trier of fact, but in a case such as this where the facts are substantially undisputed, it becomes a question of law. *Brady v. Oregon Lumber Co.,* 117 Or 188, 243 P 96.

■ The term "accidental bodily injury" in an insurance policy has assumed no technical legal meaning in the law. It is our duty to place upon the word "accident" its common meaning—the meaning which a purchaser of a policy of accident insurance places upon that word when he buys a policy. *Borglund v. World Ins. Co.,* 211 Or 175, 315 P2d 158; *Stuart v. Occidental Life Ins. Co.,* 156 Or 522, 68 P2d 1037.

The defendant's (respondent's) brief states: "An accident denotes some sudden, unexpected happening which produces a hurtful result and is referable to a definite time and place. *Chalfant v. Arens,* 167 Or 659, 120 P2d 219, *Iwanicki v. S.I.A.C.,* 104 Or 650, 665, 205 P 990."

This court, like many others, has held the word "accident" denotes an incident or occurrence that happened by chance, without design and contrary to intention and expectation. See *Hutchison v. Aetna Life Ins. Co.,* 182 Or 639, 189 P2d 586; *Buckles v. Continental Casualty Co.,* 197 Or 128, 251 P2d 476; *LaBarge v. United Insurance Co.,* 209 Or 282, 303 P2d 498; *Thompson v. General Insurance Co. of America,* 226 Or 205, 359 P2d 1097.

■ This court is committed by *Buckles v. Con-*

*tinental Casualty Co.*, supra, to the rule which distinguishes between accidental means and accidental results from intended means. This rule, as thus adopted, was expressed in the following language in *Caldwell v. Travelers Ins. Co.*, 305 Mo 619, 267 SW 907, 39 ALR 56:

> "Where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen."

See also *Bertschinger v. N. Y. Life Ins. Co.*, 166 Or 307, 111 P2d 1016.

In *National Life Insurance Co. v. Patrick*, 28 Ohio App 267, 162 NE 680, the policy of insurance had this provision:

> "At the rate of $35 per month for the period not exceeding 5 consecutive years, that bodily injuries effected during the life of this policy solely through external, violent, and accidental means shall, directly and independently of all other causes, wholly and continuously from date of accident, disable * * *."

The coal wagon, containing two tons of coal, which the insured drove became stuck in a muddy street. The insured undertook to unload the coal. According to the decision, "there was a blizzard and the weather was cold." An hour and a half was required for the insured to unload the coal. When he had completed the work he noticed that the fingers of one of his hands were frozen stiff. Five days later all of the fingers and thumb of one hand were amputated and

parts of those of the other. In holding that the loss of the fingers was within the policy's terms of "external, violent, and accidental means," the court quoted the following from *U. S. Mutual Accident Association v. Barry,* 131 US 100, 9 S Ct 755, 33 L Ed 60:

> "That the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected;' * * * if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means."

From the decision we also quote the following:

> "An accident is ' "an event happening without the concurrence of the will of the person by whose agency it was caused;" "any event that takes place without one's foresight or expectation;" "anything occurring unexpectedly, or without known or assignable cause;" * * * "that which happens without one's direct intention." * * * The opposite of accident is design, volition, intent.' Aetna Life Ins. Co. v. Vandecar, 86 F. 282, 285, 30 C.C.C. 48."

In expressing its conclusion, the court stated:

> "From these definitions it is our holding that under the facts in the case the injury was due to accidental means. Had the plaintiff's fingers come in contact with a hot iron without any volition and in any unusual and unexpected manner, there would be no question that the injury resulted from accidental means. Because the injury arose from a freezing atmosphere, the disastrous result of which was unusual and unexpected, the cause of the injury was no less an accident. * * *"

In *N. W. Commercial Travellers' Association v. The London Guarantee and Accident Co.,* 10 Mani-

toba Reports 537, the insured lost his life in a manner substantially similar to that whereby death came to Finley in the case at bar. The insured, C. F. Church, was a commercial traveler who in November of 1892 was calling upon the trade in the Northwest Territories. He employed a wagon, containing his samples, and a driver. Church had been to a place entitled Black's Ranche and was returning to Macleod which was twenty miles distant when the wagon broke down. The hour was one p.m., and the temperature was 20 degrees below zero. Snow was falling; a strong wind was blowing; and it was difficult to detect the location of the road. When the wagon broke down, the driver suggested that the two mount horses and ride to Macleod. Church replied that he was unable to ride. He added that he was incapable of walking to Macleod and that therefore he would remain in the wagon. The driver agreed to ride a horse to Macleod and upon reaching that place send a rescue party for Church. By the time that he had reached Macleod and the rescue party had started, darkness had descended and the party lost its way. When a second rescue party came upon Church at about two o'clock the next morning they found him frozen to death.

The policy required the company to pay its amount upon receipt of "proof that the assured shall have sustained bodily injuries effected through external, violent and accidental means, within the intent and meaning of this contract."

Each of the three members of the court delivered an opinion. Justice Bain stated:

"* * * he met his death from exposure to a risk to which all who are compelled to drive over the plains of the North West in winter, as he was doing, are in some degree liable. His death under

the circumstances I have above set forth, was certainly the result of accident, * * *."

He added that in construing policies such as the one before the court:

"* * * the words of the policy are to be construed, not according to their strictly philosophical or scientific meaning, but in their ordinary and popular sense. It is popular language that is used, and popular language should be construed popularly; and as it was the Company itself which prepared the contract, any ambiguity there may be found in it will be taken most strongly against the Company.

"* * * In the same way, it seems to me, Church's death, occurring as it did under the circumstances I have set forth, was certainly accidental; and I think it may properly be said that the injury which caused his death was effected by accidental means in the sense in which these words are used in the policy."

Justice Dubuc declared:

"An accident is defined to be 'an event happening without a concurrence of the will of the person by whose agency it was caused,' or 'any event that takes place without one's foresight or expectation,' and again 'the happening of an event without the aid and the design of the person, and which is unforeseen.'

"* * * It was by accident that Church was so benumbed by cold that he could neither walk nor drive the eight or nine miles remaining to be made to reach Macleod. It was by accident that while awaiting there the return of the driver or other persons to rescue him, he became insensible by cold and was frozen to death. * * * When he started in the morning he had no reason to anticipate * * * that the trail would be lost and the wagon broken. * * *"

Justice Killam expressed his conclusion in the following significant language:

> "Here Church was, through several unforeseen circumstances, kept exposed to the action of the cold and the storm until these produced injuries which caused his death. The breaking of the wagon, the loss of the trail, the difficulty in finding him, all gave to the continuance of this exposure the character of accident."

In *Callahan v. Connecticut General Life Insurance Co.,* 357 Mo 187, 207 SW2d 279, the policy provided:

> "If the death of the Insured * * * results from accidental bodily injuries as defined below, the Company will * * * pay in addition to the face amount of this policy the sum of $2,500.
>
> "Accidental Bodily Injuries are defined as bodily injuries effected directly and independently of all other causes through external, violent, and accidental means, where * * * there is a visible contusion or wound on the exterior of the body, and which independently and exclusively of all other causes result in the death of the Insured within ninety days from the date of the accident:
>
> "Provided: that this section shall not cover death resulting directly or indirectly, wholly or partly, from: * * * bacterial infections (except pyogenic infections which shall occur with and through an accidental cut or wound) * * *."

The insured, Callahan, and a friend had done some drinking and presently, while the two were at a tavern, Callahan departed alone—presumably heading for his home. Shortly, he drove off of the side of the road and his car became mired in the soft ground of the highway ditch. He was unable to extricate the car and spent the night and part of the next day in it. The weather was cold and two to four inches of snow was upon the ground. When the insured was finally

rescued his feet were frozen and he developed tetanus. He died fourteen days later. The court held that those facts warranted the jury's verdict in favor of the plaintiff. The resulting judgment was affirmed. Had he not unintentionally, that is, accidently, got into the ditch, the cold would not have taken his life.

The policy in *Wills v. Midland National Life Insurance Co.*, 108 Mont 536, 91 P2d 695, provided for double indemnity for death "in consequence of bodily injury effected solely through external, violent and accidental means." The insured, who lived in Butte, Montana, left his home by streetcar for the downtown section of the city where he attended a moving picture theater. When he left home the temperature was between zero and 10 below. Then a severe drop occurred and by the time the insured started for home about 11 p.m. snow was falling, a blizzard was raging, and the temperature was 40 degrees below zero. The insured undertook to return home by streetcar. The windows of the car in which he rode were frosted and he was unable to see the streets. Because of that situation he left the car about five blocks before reaching his proper street and was compelled to walk—with the wind against him, and the temperature at 40 degrees below zero—through deep snow upon unfamiliar streets. The next day his frozen body was found in the snow. The court held that the above facts justified a finding of accidental death through external, violent and accidental means. Quoting from *United States Mutual Accident Assurance v. Barry*, 131 US 100, 9 S Ct 755, 33 L Ed 60, which defined an accident as a "happening by chance; unexpectedly taking place," the court continued its quotation:

"* * * So here, insured became lost acci-

dentally, and thereby suffered accidental and enforced exposure to storm and frost and thereby died. The storm and frost were, in the season of the year and in this latitude, usual incidents of weather. They were not accidental. 1 C.J. 391. But because of insured's accidental exposure to them, the storm and frost so joined with the exposure became the accidental means of death. * * *"

The insurance company in *Commonwealth Casualty Company of Phila. v. Wheeler,* 13 Ohio App 140, had issued a policy of accident insurance to C. Y. Wheeler which protected "from bodily injury sustained during the life of this policy solely through external, violent and accidental means." The policy also conditioned liability upon proof that the insured lost his life "solely from sunstroke, freezing or hydrophobia, due directly to 'such injury.'"

After Wheeler had walked about two miles on his way home from his place of employment at a time when the temperature was about 20 degrees below zero he stopped at the home of his daughter and complained to her that portions of his face were frozen. While so doing he drew near a fire, sat in a chair and after conversing for about five minutes suddenly fell to the floor. A physician shortly pronounced him dead. The physician testified that Wheeler "was frozen to death from exposure." In sustaining liability under the policy the decision quoted from *Pack v. Prudential Casualty Company,* 170 Ky 47:

"The very purpose of accident insurance is to protect the insured against accidents that occur when he is going about his business or attending to his work or affairs in the usual way without any thought of being injured or killed, and when there is no probability, in the ordinary course of human experience, that he will meet with accident

or death. The reason why men secure accident insurance is to protect them against unforeseen and unexpected accidents that may happen in the ordinary course of their lives and when they are pursuing in the usual way their daily vocations, or doing in the ordinary way the things that men do in the common, every-day affairs of life."

■ It is true that in the case at bar the insured, Finley, intended to drive upon this mountain road and could reasonably have expected to meet with cold and snow. We saw from the decisions of which we have taken note that exposure to the weather does not alone constitute accidental injury. The exposure must be by chance; it must be unintended, accidental and contrary to the plans of the insured.

■ It is clear that in this case Finley's exposure to the cold, while he was carried by Flury for a mile and a half through deep snow and at an extremely low temperature, was contrary to his intentions and plans. It happened accidentally when the truck became stalled in the snow and its mechanical parts became disabled. No one had foreseen a possibility that it would be necessary to abandon the truck and carry Finley for two hours through the extreme cold to the cabin. It was in the journey just mentioned that Finley incurred the frost-bite that took his life. The decisions previously reviewed indicate that it is entirely reasonable to deem the disablement of the truck within the connotation of the term "accidental." Thus, Finley was accidentally exposed to the severe cold that took his life. He certainly had never intended to impose upon his young friend, who had had nothing whatever to eat for two days, the arduous task of carrying him through deep snow at night time for a mile and a half.

The two men did not leave a place of shelter and

warmth to go out in the cold, but departed from a place where they were in imminent danger of freezing to make their way to relative safety. The fact just mentioned distinguishes this case from *Brady v. Oregon Lumber Co.,* 117 Or 188, 243 P 96. Brady, an employee of Oregon Lumber Company, sustained frostbite necessitating amputation of his right toes and lower left leg. The lumber camp had been closed for the season because of heavy snow and the foreman told the employees they would be returned to the valley by a company train. When the train failed to arrive that day the plaintiff and several others set out on foot. We denied plaintiff recovery inter alia because he left a place of safety and warmth and "willfully plunged into a situation that proved to be dangerous." The Brady opinion distinguished *Schumaker v. St. Paul D. R. Co.,* 46 Minn 39, 48 NW 559. There the railway company had transported Shumaker to his place of work but where there was no food and no shelter. The weather was very cold. Under those conditions Schumaker walked to the nearest shelter and in so doing suffered injury by freezing during his journey. The Minnesota court allowed Schumaker to recover.

The injuries that Finley sustained and for which he was necessarily confined to the hospital were caused by his accidental exposure to the sub-zero temperature.

■ Plaintiff's first cause of action seeks recovery of $57.14 plus $150 attorney fees. This figure of $57.14 is equal to four-sevenths of the weekly hospitalization benefits payable under Part Two a of the policy. The weekly benefits, it will be recalled, were $100 for a maximum of fifty-two weeks. The record does not disclose exactly when the insured was admitted to the hospital, but the period of his confinement can fairly

be constructed from the facts in the record. The stipulation read into the record by counsel for defendant contains this statement:

"* * * Mr. Finley developed acute bronchopneumonia and died on the 25th day of January, 1962 at the hour of 10:05 p.m., four days after his admission to the hospital * * *."

Insured was rescued from the cabin about four o'clock in the afternoon of Monday, January 22. He was taken immediately to the hospital in Lakeview, a distance of about 45 miles. It is reasonable to assume he was admitted sometime in the afternoon of that day.

We hold the plaintiff is entitled to four days' confinement benefits equal to $57.14 plus $150 attorney fees on her first cause of action.

Plaintiff's second and third assignments of error challenge findings made by the trial court. These two assignments of error relate to Mrs. Finley's second cause of action for recovery under Part Three of the policy. The trial court found that plaintiff had failed to prove Mr. Finley was driving or riding within any automobile at the time he sustained accidental bodily injury or that Mr. Finley sustained accidental bodily injury resulting from the damaging of the truck.

■ Part Three of the insurance policy allows a recovery of $5,000 if the insured

"* * * shall sustain such accidental bodily injury while driving or riding within any automobile, truck or bus and such injury resulting from the damaging of said conveyance shall, directly and independently of all other causes, within 60 days result in the death * * *."

The arguments of counsel reveal a disparity of opinion as to the coverage extended by this provision. The

duty of construing this clause in light of the facts of this case devolves upon this court. When construing an insurance contract we must construe it, within reason, most favorably to the insured and least favorably to the author of the policy. But we cannot by the device of judicial construction increase the coverage of the insured beyond the reasonable intendment of the parties. We cannot, in essence, write a contract of insurance for the parties.

■ The risk assumed by the insurance company in consideration of the premiums paid by insured can be determined in part by considering the policy in its entirety. The character of the policy is expressed in bold face lettering on the back cover of the policy and in the same words again in bold face type on the first page.[1] The only provision relating to compensation for accidental death is found in Part Three. This clause is entitled "Accidental Death Benefits" and the entire clause, though imperfectly expressed, is implicit with the requirement of accident precedent to recovery; that is, accidental damaging of the conveyance as well as accidental injury to the insured.

The requirement of accidental damage to the vehicle is not expressed in the provision (Part Three) but is fairly implied from the character of the policy and the express provision "such injury resulting from the damaging of said conveyance." "Such injury" is defined in Part One as "accidental bodily injury" and this definition applies throughout the policy. The compensable injury is accidental bodily injury resulting from the damaging of the conveyance; consequently,

---

[1] "This policy provides benefits for loss of life from specified accidents and for other expenses resulting from accidental bodily injury and sickness, to the extent herein limited and provided and is renewable at the option of the company only."

if the damage to the vehicle is not accidental and the bodily injury results from this damaging, it is difficult to see how the bodily injury can be deemed accidental. In other words, if the bodily injuries are accidental, there must have been an intervening accidental means that caused the injury.

As indicated, the term "resulting from" demands a causal relationship between the damaging of the conveyance and the death of insured "directly and independently of all other causes" from the injuries. This question of proximate cause must be faced only in determining the relation between the damaging of the conveyance and the injuries of insured. Determination of the actual cause of death is controlled by the contract of insurance that provides that death must be caused "directly and independently of all other causes" by the accidental injuries. Consequently, assuming arguendo that death was so caused, the question still remains whether the accidental injury was proximately caused by the damaging of the conveyance.

This analysis requires first a determination of the meaning of "damaging of said conveyance." The plaintiff urges on our consideration the proposition that damage to the conveyance would include any disablement of the vehicle or reduction in its value. Specifically, she contends that when the truck was stalled in the snow and the radiator froze the vehicle was disabled and reduced in value and there was therefore a damaging of the conveyance. Appellant cites four cases from other jurisdictions in support of this proposition: *North American Accident Ins. Co. v. McAlister,* 290 Ky 88, 160 SW2d 385; *Miller v. Inter-Ocean Casualty Co.* (W. Va) 158 SE 706; *Walden v. Auto Owners Safety Ins. Co.,* 228 Ark 983, 311 SW2d 780; *Wright*

*v. Aetna Ins. Co.,* 10 F2d 281, 17 F2d 596, 46 ALR 225. None of those cases required the court to determine the meaning of damage to a motor vehicle. In *North American Acc. Co. v. McAlister,* supra, the policy insured against death resulting directly, independently and exclusively of all other causes from bodily injuries effected solely through external, violent and accidental means and sustained by the insured "in the wrecking or disablement" of any private automobile in which insured was riding.

The policy in *Miller v. Inter-Ocean Casualty Co.,* supra, insured against:

"\* \* \* The effects of bodily injury caused directly, exclusively and independently of all other causes by external, violent and accidental means, and which bodily injury is sustained by the insured in (1) Automobile accidents, while operating, driving, riding in or on \* \* \* an automobile."

We decline, in this instance, to equate "damaging" with "disablement." An automobile may in many instances be disabled or reduced in value without suffering any damage in the ordinary contemplation of that term. When a vehicle runs out of gasoline it is disabled, but one would rarely say it is damaged. Likewise, if a vehicle's progress is impeded by mud or snow, it is disabled and reduced in value but not necessarily damaged. The damage in these instances is not to the vehicle itself but to the purse of the owner. The word "damaging," as used in this policy, means a partial destruction of the conveyance by accident.

The insured and his companion became stalled in the snow on the roadway. The truck at this point was disabled; although the engine was running it could

not be disengaged from the snow. The two men remained in the truck with the engine running and the heater operating until the coolant in the radiator froze. This freezing of the cooling liquid caused the radiator to "boil over" and the engine to subsequently stop. There was disablement but no actual physical damage to the truck. The facts submitted in this case fail to sustain plaintiff's second cause of action under Part Three of the policy.

The judgment of the circuit court in the plaintiff's first cause of action is reversed and she is allowed recovery of $57.14 plus $150 attorney fees under Part One and Part Two a of the policy. The judgment in appellant's second cause of action is affirmed.