Argued and submitted May 9, decision of the Court of Appeals is affirmed and reversed in part; judgment of the circuit court affirmed as to United States Fire Insurance Company and reversed as to all other insurers; case remanded to the circuit court for further proceedings September 26, 1996

## ST. PAUL FIRE & MARINE INSURANCE COMPANY, INC.,
and St. Paul Mercury Insurance Company, Inc.,
*Petitioners on Review / Respondents on Review,*

*v.*

## McCORMICK & BAXTER CREOSOTING CO.,
*Respondent on Review / Petitioner on Review,*

*and*

## NATIONAL CONTINENTAL INSURANCE COMPANY,
successor to American Star Insurance Company by change of name;
Consolidated American Insurance Company;
Hartford Accident & Indemnity Company;
United States Fire Insurance Company;
Gulf Insurance Company,
*Respondents on Review,*

*and*

## CERTAIN UNDERWRITERS AT LLOYD'S, LONDON;
Continental Casualty Company,
*Petitioners on Review / Respondents on Review,*

*and*

## SCOTTSDALE INSURANCE COMPANY;
Boston Insurance Company;
Mission Insurance Company (in liquidation);
Mission National Insurance Company (in liquidation)
and National Union Fire Insurance
Company of Pittsburgh, Pennsylvania,
*Defendants.*

## McCORMICK & BAXTER CREOSOTING CO.,
*Petitioner on Review / Respondent on Review,*

*v.*

## ST. PAUL FIRE & MARINE INSURANCE COMPANY, INC.;
St. Paul Mercury Insurance Company, Inc.,
*Respondents on Review / Petitioners on Review,*

*and*

NATIONAL CONTINENTAL INSURANCE COMPANY,
successor to American Star Insurance Company
by change of name;
Consolidated American Insurance Company;
Hartford Accident & Indemnity Company;
United States Fire Insurance Company;
Gulf Insurance Company and
National Fire Insurance Company of Hartford,
*Respondents on Review,*
*and*

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON;
Continental Casualty Company,
*Respondents on Review / Petitioners on Review,*
*and*

SCOTTSDALE INSURANCE COMPANY;
Boston Insurance Company;
Mission Insurance Company (in liquidation)
and Mission National Insurance Company (in liquidation),
*Cross-Defendants.*

(CC A8711-07096; CA A71072; SC S41582, S41584)
(Consolidated for Argument and Opinion)

923 P2d 1200

186

Jeffrey L. Fillerup, of Luce, Forward, Hamilton & Scripps, San Francisco, California, argued the cause for petitioners on review/respondents on review St. Paul Fire & Marine Insurance Company and St. Paul Mercury Insurance Company, Inc. With him on the briefs were Robin Craig-Olson, San Francisco, and Thomas A. Gordon and Gene D. Kennedy, of Gordon & Polscer, Portland.

Jay T. Waldron, of Schwabe, Williamson & Wyatt, Portland, argued the cause for petitioners on review/respondents on review Certain Underwriters at Lloyd's, London, and Continental Casualty Company. With him on the brief was Mildred J. Carmack.

F. Scott Farleigh and Karen E. Saul, of Farleigh, Wada & Witt, P.C., Portland, filed a brief for respondent on review/petitioner on review Certain Underwriters at Lloyd's, London. With them on the brief were Paul D. Nelson and Michael A. Gevertz, of Hancock Rothert & Bunshoft, San Francisco, California.

Peter R. Chamberlain, of Bodyfelt Mount Stroup & Chamberlain, Portland, argued the cause for respondent on review Hartford Accident & Indemnity Company. With him on the brief were Barry M. Mount and Richard A. Lee.

David M. Jacobi, of Wilson, Smith, Cochran & Dickerson, Seattle, Washington, argued the cause for respondent on review United States Fire Insurance Company. With him on the brief was Mark A. Hiefield, of Underwood, Norwood & Hiefield, Portland.

Barry S. Levin, of Heller, Ehrman, White & McAuliffe, San Francisco, California, argued the cause for respondent on review/petitioner on review McCormick & Baxter Creosoting Co. With him on the briefs were Daniel J. Dunne, Jr., San Francisco, Eric R. Todderud, Portland, and Paul R. Gary, of Paul R. Gary, P.C., Portland.

George W. McKallip, Jr., of Kennedy, King & Zimmer, Portland, filed the briefs for respondents on review National Continental Insurance Company and Consolidated American Insurance Company. With him on a brief for respondent on review Gulf Insurance Company was Mildred J. Carmack, of Schwabe, Williamson & Wyatt, Portland.

Philip Schradle and Stephanie L. Striffler, Assistant Attorneys General, and Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem, filed briefs on behalf of *amicus curiae* Oregon Department of Environmental Quality.

James T. McDermott and James L. Buchal, of Ball, Janik & Novack, Portland, filed a brief on behalf of *amici curiae* Associated Oregon Industries, Schnitzer Steel Industries, Inc., Schnitzer Investment Corp., and Unified Sewerage Agency of Washington County.

Steven J. Dolmanisth, Eugene R. Anderson, Finley T. Harckham, and Marjorie Han, of Anderson Kill Olick & Oshinsky, P.C., New York, New York, filed briefs on behalf of *amici curiae* Columbia Corridor Association, Jesuit High School, Cascade Corporation, Reynolds Metal Company, Carr Chevrolet Co., Inc., and Esco Corporation.

I. Franklin Hunsaker, of Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, filed a brief on behalf of *amicus curiae* Insurance Environmental Litigation Association. With him of counsel on the brief were Laura A. Foggan, Daniel E. Troy, and Luis de la Torre, of Wiley, of Rein & Fielding, Washington, D.C.

Jeffrey V. Hill and Bradford H. Lamb, of Zarosinski & Hill, Portland, filed a brief on behalf of *amicus curiae* Aetna Casualty and Surety Company. With them of counsel on the brief were Edward Zampino, Peter E. Mueller, and Victor C. Harwood, III, of Harwood Lloyd, Hackensack, New Jersey.

Before Carson, Chief Justice, and Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

GRABER, J.

---

** Gillette and Unis, JJ., did not participate in the consideration or decision of this case; Unis, J., retired June 30, 1996.

**GRABER, J.**

This case involves insurance coverage under a number of general comprehensive liability (GCL) policies issued to McCormick & Baxter Creosoting Co. (M&B), by different insurers, from 1949 through 1985. M&B seeks coverage under those policies for costs incurred in investigating and correcting environmental contamination that resulted from its operations in California and Oregon. The trial court concluded that the policies did not cover M&B for that environmental damage and granted the insurers' motions for summary judgment. The Court of Appeals affirmed in part and reversed in part the judgment of the trial court. *St. Paul Fire v. McCormick & Baxter Creosoting*, 126 Or App 689, 707, 870 P2d 260, *modified on recons* 128 Or App 234, 238, 875 P2d 537 (1994). For the following reasons, we affirm in part and reverse in part the decision of the Court of Appeals.

## I. FACTS AND PROCEDURAL BACKGROUND

This case comes to us on review of the trial court's grant of the insurers' motions for summary judgment. Accordingly, we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to M&B, the nonmoving party. ORCP 47 C; *Fields v. Jantec, Inc.*, 317 Or 432, 437, 857 P2d 95 (1993). On review, we determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Fields*, 317 Or at 437.

M&B has owned and operated wood treatment plants since 1942 in Stockton, California, and since 1945 in Portland, Oregon. At those plants, during the relevant period (1949-85), M&B treated a variety of wood products. The treatment processes included the use of pentachlorophenol (PCP), creosote (a coal tar derivative, which usually is mixed with fuel oil before application), and heavy metal salts such as arsenic, chromium, and copper. As a result of M&B's operations at both facilities, chemicals leached into the soil and contaminated the soil and groundwater. At the Portland plant, surface water also was contaminated.

The contamination at both plants is attributable, in part, to leaching from "surface impoundments." "Surface

impoundments" were uncovered pits that M&B used to store the waste water produced during the wood treatment processes. M&B used surface impoundments from 1967 to 1971 in Portland, and from 1942 to 1978 in Stockton. During those periods, surface impoundments were standard in the wood treatment industry. They were believed to hold the waste and to permit liquids to evaporate over time.

In the late 1970s, however, M&B learned that contaminants placed in the surface impoundments leached through layers of soil into the subsurface soil and groundwater. That leaching began within a year after the initial use of the surface impoundments.

Additional damage was caused by overflow from storage tanks, by equipment failures, and by storm-water runoff from treated products and equipment, which were coated with preservatives. Preservatives also dripped and spilled onto unprotected soil.

M&B also presented evidence that, during a labor dispute at the Portland plant in 1949 or 1950, someone opened a flange bolt on a storage tank, causing nearly 50,000 gallons of creosote to spill onto the soil.[1] That contamination reached the groundwater within a year.

In 1974, M&B began working with the California Regional Water Quality Control Board to develop a plan for treatment of waste water at the Stockton site. In 1978, M&B agreed to a consent decree requiring clean-up and abatement. In 1983, after an inspection of the Stockton site, the California Department of Health Services found that M&B had violated the California Hazardous Waste Control Act. Cal Health & Safety Code § 25100 *et seq.* M&B faced civil and criminal penalties if it did not clean up the contaminated soil and groundwater. M&B agreed to do so in a consent decree that it entered into with those agencies in July 1984.

In 1983, M&B notified the Oregon Department of Environmental Quality (DEQ) that there was soil and groundwater contamination at the Portland site. DEQ and

---

[1] The Court of Appeals held that some of that evidence was inadmissible. 126 Or App at 706. That issue is discussed below, 324 Or at 208-09.

M&B entered into a consent decree in 1987, under which M&B was to clean up the contamination.[2]

In 1987, M&B demanded that its insurers defend and indemnify it with respect to the investigation and clean-up costs for the Stockton and Portland sites. St. Paul Fire & Marine Insurance Company, Inc., and St. Paul Mercury Insurance Company, Inc. (collectively referred to as St. Paul), insurers that had sold a GCL policy to M&B, then filed this declaratory judgment action. St. Paul seeks a declaration that it is not obligated to defend or indemnify M&B for any of the investigation or clean-up costs relating to either site. In addition to naming M&B as a defendant, St. Paul named as defendants other insurance companies that had issued liability policies to M&B. St. Paul seeks a declaration that, if coverage exists under its policy with M&B, then coverage exists under those other insurers' policies as well. M&B filed an answer to St. Paul's complaint and cross-claims against all other insurer defendants, seeking damages for breach of contract and a declaration that the insurers have a duty to defend M&B in environmental administrative proceedings and to indemnify M&B for its investigative and environmental clean-up costs.

On motions for summary judgment, the trial court held that M&B did not have coverage under any of the insurance policies issued by the insurers between 1949 and 1985. The court granted summary judgment to several insurers that had issued policies before 1970, on the theory that the damage at issue in this case had not been triggered until after the coverages had expired (the "trigger-of-coverage" issue). The trial court granted summary judgment to several insurers that had issued policies that covered damage "caused by accident," on the theory that no "accident" had occurred under the terms of those policies (the "caused-by-accident" issue). The trial court granted summary judgment to several insurers that had issued policies in the 1970s and 1980s, on the theory that those policies contained "pollution

---

[2] In 1988, M&B paid over $2 million in clean-up costs. M&B later filed a bankruptcy proceeding. In 1990, the bankruptcy court approved a reorganization plan under which M&B remains responsible for cleaning up the Stockton and Portland plants.

exclusions" that excluded coverage for the damage sustained in this case (the "pollution-exclusion" issue). The trial court entered a judgment, ORCP 67 A, for the insurers.

M&B appealed. The Court of Appeals reversed the trial court on the trigger-of-coverage issue. 126 Or App at 697-99. The Court of Appeals affirmed the trial court's holdings as to the caused-by-accident and pollution-exclusion issues. *Id.* at 702-07. It also held that an affidavit on which M&B relied was inadmissible. *Id.* at 705-06. On reconsideration, the Court of Appeals modified one of its factual conclusions as to the coverage issued by one insurer. 128 Or App at 238.

Both M&B and the insurers petitioned this court for review. We allowed both petitions.

## II.  INTERPRETATION OF INSURANCE POLICIES GENERALLY

Although the insurance policies at issue contain different terms and, therefore, must be considered individually, certain rules of construction apply to all such policies. *See generally Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469-71, 836 P2d 703 (1992) (delineating the factors used by Oregon courts in determining the meaning of a provision in an insurance policy). Accordingly, before turning to the terms of the individual policies, we begin by stating those rules of construction that affect all the policies.

The interpretation of the terms of an insurance policy is a question of law. *Id.* at 469. In interpreting a policy, a court's goal is to ascertain the intent of the parties, based on the terms and conditions of the policy. *Ibid.* Ambiguous terms in an insurance policy are "construed against the insurer, who drafted the policy." *Id.* at 470. In *Hoffman*, this court explained when a term is ambiguous:

> "For a term to be ambiguous in a sense that justifies resort to the foregoing rule, however, there needs to be more than a showing of two plausible interpretations; given the breadth and flexibility of the English language, the task of suggesting plausible alternative meanings is no challenge to capable counsel. Competing plausible interpretations

simply establish ambiguity that will require some interpretive act by the court. This triggers a series of analytical steps, any one of which may resolve the ambiguity. The rule on which plaintiffs rely is the last of these steps. In other words, a term is ambiguous in a sense that justifies application of the rule of construction against the insurer *only* if two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continue to be reasonable, after the interpretations are examined in the light of, among other things, the particular context in which that term is used in the policy and the broader context of the policy as a whole. Ambiguity requires resort ultimately to the rule [of construction against the drafter] because, when two or more competing, plausible interpretations survive the kind of scrutiny described, the term still must 'reasonably be given a broader or a narrower meaning, depending upon the intention of the parties in the context in which such words are used by them.' That is, when two or more competing, plausible interpretations prove to be reasonable after all other methods for resolving the dispute over the meaning of particular words fail, *then* the rule of interpretation against the drafter of the language becomes applicable, because the ambiguity cannot be permitted to survive. It must be resolved." *Id.* at 470-71 (emphasis in original; citations omitted).

With the foregoing principles in mind, we will examine the specific policies at issue.

## III. THE INSURANCE POLICIES

M&B bought numerous insurance policies from different insurers between 1949 and 1985. As now relevant, those policies contained three kinds of terms.

A. *Policies Providing Coverage for Property Damage "Caused by Accident"*[3]

From September 1949 to September 1953, M&B had a series of third-party GCL policies with Hartford Accident & Indemnity Company (Hartford). Those policies contained the following "caused-by-accident" clause:

---

[3] In the trial court, plaintiff was unable to produce some of the Hartford and St. Paul policies. The trial court ruled that the existence of those policies is a question of fact. No party has asked us to review that ruling, and we do not consider it further.

> "[Hartford agrees t]o Pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed by him under contract as defined in the policy for damages because of injuries to or destruction of property, including loss of use thereof, *caused by accident* * * *." (Emphasis added.)

The policy also contained the following trigger-of-coverage clause:

> "This policy applies only to accidents which *occur during the policy period* * * *." (Emphasis added.)

The term "accident" was not defined in the policy.

From September 1953 to September 1956, M&B had a third-party GCL insurance agreement with National Fire Insurance Company of Hartford (National Fire). That policy was identical to the Hartford policies in all material respects.

From September 1956 to September 1959, M&B had a third-party GCL insurance agreement with St. Paul Mercury Insurance Company; and, from September 1959 to September 1962, M&B had a third-party GCL policy with St. Paul Fire and Marine Insurance Company. Those policies were identical to the National Fire and Hartford policies in all material respects.

B. *Policies Providing Coverage for "Occurrences"*

From September 1962 to September 1965, M&B had a third-party GCL policy with St. Paul. That policy contained the following "caused-by-accident" clause:

> "[St. Paul agrees t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

The policy also contained this endorsement, however:

> "IT IS UNDERSTOOD AND AGREED THAT:
>
> "1. With respect to [coverage for property damage] the words 'caused by accident' are deleted and the words 'resulting from an occurrence' are substituted in Lieu thereof.

"Where ever used in the policy with respect to the foregoing coverages the word 'accident' shall be construed to mean 'occurrence.'

"The word 'occurrence' means an unexpected event or happening which results in injury to or destruction of tangible property during the policy period, or a continuous or repeated exposure to conditions which result in direct injury to or destruction of tangible property during the policy period, provided the insured did not intend or anticipate that injury to or destruction of property would result. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

The St. Paul policy contained the following trigger-of-coverage clause:

"This Policy applies * * * to occurrences or accidents taking place within the United States of America, its territories or possessions and Canada during the Policy Period."

After the St. Paul policy expired, M&B continued to purchase GCL policies from other insurers. In addition, for almost 12 years, M&B had excess liability policies, which gave M&B coverage beyond that provided in the underlying GCL policies.

From May 1965 to May 1968, M&B had a third-party GCL policy with National Continental Insurance Company (National Continental).[4] The National Continental policy contained the same caused-by-accident and trigger-of-coverage clauses as the St. Paul (1962-65) policy. The National Continental policy contained an endorsement that provided in part:

"In consideration of the premium charged, it is agreed that:

"1.    The words 'caused by accident' as used in [reference to coverage for property damage] are deleted. The word 'accident' wherever used in this policy with respect to 'Property Damage Liability—Except Automobile' shall be construed to mean 'occurrence.'

---

[4] The 1965 to 1968 and 1968 to 1971 insurance agreements were between M&B and American Star Insurance Company. American Star changed its name to National Continental Insurance Company. For the sake of clarity, we refer to American Star as National Continental (its new name) throughout this opinion.

"2. 'Occurrence' means a happening or a continuous or repeated exposure to the same general conditions, which, unexpected by the insured, causes injury to or destruction of corporeal property during the policy period."

From September 1968 to September 1971, M&B had a third-party GCL agreement with National Continental. Under that contract, National Continental agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * damage to or destruction of property of others." (Boldface deleted.) That policy covered damages for an "occurrence," but the term "occurrence" was not defined in the policy.[5] That policy contained the following trigger-of-coverage clause:

"All of the coverages afforded by this policy are LIMITED to bodily injury or property damage which is ACTUALLY SUSTAINED during the policy period:

"1. in the United States of America, its territories or possessions, or Canada." (Boldface deleted.)

From 1964 through 1969, M&B had a series of excess third-party property damage GCL insurance agreements with Certain Underwriters at Lloyd's, London (Lloyd's). The Lloyd's policies covered "damage to or destruction of property of others * * * *caused by accident* occurring during the period mentioned [in the policy]." (Emphasis added.) The policies issued before 1967 contained the following endorsement:

"The words 'caused by accident' in the Insuring Clause in this Insurance and the definition of the word 'accident' in this Insurance shall be deemed to be deleted.

"The words 'accident' or 'accidents' wherever appearing elsewhere in this Insurance shall be deemed to read 'occurrence' or 'occurrences' respectively.

"The words 'occurrence' or 'occurrences' shall be deemed to have the same meaning in this insurance as is attributed

---

[5] In 1970, a "pollution exclusion" was added by endorsement to the National Continental contract. We quote that pollution exclusion in text below, 324 Or at 198.

to them in the policy(ies) of the Primary Insurers but, notwithstanding the foregoing, for the purposes of this Insurance all occurrences arising out of one event shall be treated as one occurrence."

In 1967, the definition of "occurrence" in the Lloyd's policy was amended to read:

"For the purpose of determining the limit of Underwriters' liability, all * * * Property Damage arising out of either,

"i)   one event or

"ii)  a continuous or repeated exposure to substantially the same general conditions,

"shall be considered as arising out of one occurrence.

"* * * * *

"Under 'DEFINITIONS' (a) Accident is deleted and replaced by the following:

"(a)  OCCURRENCE. The word 'occurrence' means an accident, including injurious exposure to conditions, which results, during the period of insurance mentioned in the Schedule, in * * * Property Damage neither expected nor intended from the standpoint of the Assured."

The Lloyd's policy issued in 1968 was identical in all material respects to the Lloyd's policy issued in 1966. The 1968 policy did not make reference to the amended definition of "occurrence" contained in the 1967 policy, however.

From 1967 to 1970, M&B also had an excess third-party property damage GCL policy with Continental Casualty Company (Continental Casualty). Under that policy, Continental Casualty agreed to indemnify M&B for

"all sums * * * imposed upon the Insured by law, or * * * assumed by the Insured under contract or agreement * * * for damages, direct or consequential, and expenses * * * on account of * * * Property Damage * * * caused by or arising out of each occurrence."

The policy defined "occurrence" as

"an event or continuous or repeated exposure to conditions, which unexpectedly causes * * * Property Damage * * *

during the policy period. All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence."

That policy contained the following trigger-of-coverage clause:

"This policy applies only to occurrences happening during the policy period anywhere in the world."

## C. *Policies Containing Pollution Exclusions*

After the 1968 to 1971 National Continental policy expired, M&B and National Continental entered into two more third-party GCL policies. The first ran from September 1971 to September 1974; the second ran from September 1974 to September 1975.

When the September 1975 policy expired, M&B entered into a series of third-party GCL insurance agreements with Consolidated American Insurance Company (Consolidated American). M&B was covered by Consolidated American from September 1975 to September 1985.

In addition, M&B had an excess policy with United States Fire Insurance Company (US Fire) from May 1970 to May 1973. From May 1973 to May 1976, M&B had an excess policy with Gulf Insurance Company (Gulf).

All the third-party liability and excess policies entered into between M&B and the foregoing insurers contained "pollution exclusions." In addition, in 1970, a pollution exclusion was added by endorsement to the National Continental (1968-71) policy. That endorsement provided:

"It is agreed that this insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*" (Emphasis added.)

The pollution exclusions in the Consolidated American, Gulf, and later National Continental policies were identical to the

pollution exclusion contained in the 1970 endorsement to the National Continental (1968-71) policy.

The US Fire policy covered "damages because of injury to or destruction of tangible property including consequential loss resulting therefrom caused by an occurrence." The pollution exclusion in that policy provided:

> "This policy shall not apply * * * to liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by an occurrence.

> "For the purpose of this endorsement * * *

>> " 'Occurrence' means a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

After 1985, M&B purchased third-party GCL policies that contained "absolute" pollution exclusions, which were more complete than the quoted pre-1985 pollution exclusions. M&B does not claim coverage under the post-1985 policies.

## IV. INTERPRETATION OF THE APPLICABLE POLICIES

As the foregoing discussion shows, the insurance policies issued to M&B fall into three categories for the purposes of our analysis here: "caused-by-accident" policies, "occurrence-based" policies, and policies containing "pollution exclusions." The insurers that issued the caused-by-accident policies and the policies with pollution exclusions argue that those policies do not provide any coverage to M&B.[6] In addition, M&B's pre-1970 insurers—both those that issued caused-by-accident policies and those that issued occurrence-based policies—argue that, because the contamination at the Stockton and Portland plants was not

---

[6] The insurers do not argue that the events at issue in this case were not "occurrences" as defined in the pertinent policies. Accordingly, as to the occurrence-based policies, if coverage is *triggered*, then coverage is provided for the harm alleged. "Occurrence" was not defined in the National Continental (1968-71) policy. National Continental does not argue that there was no occurrence, however.

*discovered* until after those policies had expired, coverage was not "triggered."

We begin with the "trigger-of-coverage" issue. We then address the "caused-by-accident" and "pollution-exclusion" issues.

## A.  *Trigger of Coverage*

■     Each pre-1970 policy contained a trigger clause that limited coverage for "accidents" or "occurrences." The trial court ruled that coverage under those policies is triggered "when the injury manifests itself. Since the injury here did not manifest itself until many years after the policy period, there was no coverage." The Court of Appeals reversed, ruling that the clear wording of the policies is contrary to the trial court's application of a "manifestation trigger." 126 Or App at 697-700.

The trigger-of-coverage clauses of the pre-1970 policies are similar in all relevant respects. The Hartford (1949-53) and National Fire (1953-56) policies provided in part: "This policy applies only to accidents which *occur during the policy period*[.]" (Emphasis added.) The St. Paul (1956-65) policy provided in part: "This policy applies * * * to occurrences or accidents *taking place* * * * *during the policy period*." (Emphasis added.) The National Continental (1965-68) policy provided in part: "This policy applies only to accidents or occurrences which *occur during the policy period*[.]" (Emphasis added.) The National Continental (1968-71) policy provided in part: "All of the coverages afforded by this policy are LIMITED to * * * property damage which is *ACTUALLY SUSTAINED during the policy period*." (Bold-face deleted; emphasis added.) The Lloyd's policies (1964-69) covered "damage to or destruction of property of others * * * caused by accident occurring *during the [policy] period*." (Emphasis added.) The Continental Casualty policy provided: "This policy applies only to occurrences *happening during the policy period*." (Emphasis added.)

The insurers argue that, under the quoted clauses, "insurance is not triggered unless an occurrence [or accident] results in covered property damage which is *discovered*, or *becomes manifest*, during the policy period." (Emphasis

added.) M&B argues that the trigger clauses of the pre-1970 policies contain no such limitation. The clear words of the trigger clauses at issue support M&B's argument.

The operative phrase in the trigger clauses contained in the caused-by-accident policies is "during the policy period." The common meaning of "during" is "at some point in the course of." *Webster's Third New Int'l Dictionary* 703 (unabridged ed 1993). The trigger clause states that, if an insurable event—*i.e.*, an accident—happens at some point in the course of the policy period, then that event is covered. There is no wording in the pertinent policies that would support the insurers' reading, and the insurers that issued the caused-by-accident policies point to none.

The insurers that issued occurrence-based policies rely on the definitions of "occurrence" to argue that "the time of an 'occurrence' * * * within the meaning of a [third-party] liability insurance policy is not the time the wrongful act was committed, but the time when the complaining third party was actually damaged." The insurers argue that the "damages" in this case (and, thus, the covered "occurrences") are the costs of investigating and remedying the environmental harm that resulted from M&B's operations. Because those "damages" were not incurred by M&B until after the occurrence-based policies had expired, the insurers argue that there was no covered "occurrence." That argument is not well taken.

The policies do not make an "occurrence" depend on the fixing of financial responsibility, or damages. Instead, the St. Paul (1962-65), National Continental (1965-68), and Lloyd's (1964-67) policies contain definitions of "occurrence" that provide that an occurrence has taken place if there is *"direct injury to or destruction of tangible property* during the policy period." (Emphasis added.) Those words are unambiguous. If *property* is injured during the policy period, there has been an "occurrence," and coverage under the policy is triggered. Nothing in the policies provides that M&B's *liability* for that injury must be established during the policy period in order for coverage to be triggered.

To the contrary, the St. Paul (1962-65), National Continental (1965-68), and Lloyd's (1964-67) policies all provided that the insurer would pay on behalf of the insured "all sums which the insured *shall become* legally obligated to pay as damages." (Emphasis added.) In other words, those policies, by their own terms, spoke of damages as sums that may be assessed against the insured in the *future*. Thus, M&B is covered for damages that it becomes legally obligated to pay even *after* the policy period, so long as an "occurrence" took place *during* the policy period.

The Continental Casualty (1967-70) and Lloyd's (1967-69) excess liability policies contain definitions of "occurrence" that are different from the definitions in the other three occurrence-based policies. Both policies define an "occurrence" as something that causes "property damage" during the policy period. Those policies also provide coverage for "all sums which the insured shall become legally obligated to pay," without a temporal limitation of when those obligations must arise for coverage to be triggered. Again, the contrast between the scope of coverage and the definition of "occurrence" demonstrates the flaw in those insurers' arguments.

In summary, all the pre-1970 policies provide coverage for either accidents or occurrences that took place during the policy period. The policies do not make coverage contingent on the time when the property damage was discovered or on the time when the insured's liability became fixed. Therefore, the trial court erred when it granted summary judgment in favor of National Fire, St. Paul, Lloyd's, National Continental, and Continental Casualty on the trigger-of-coverage issue.[7] The Court of Appeals correctly reversed the trial court in that respect.

B. *The "Caused-by-Accident" Policies*

1. *The Meaning of "Accident" and Evidence of "Accidents"*

As discussed above, the Hartford (1949-53), National Fire (1953-56), and St. Paul (1956-62) policies covered

---

[7] The trial court's grant of summary judgment in favor of Hartford was not based on the trigger clauses in the Hartford policies. However, the Hartford policies contained trigger clauses with the same operative wording as was found in the other policies.

third-party property damage "caused by accident." The trial court granted summary judgment in favor of Hartford, National Fire, and St. Paul, ruling that M&B had failed to present any evidence to establish that there had been any "accident" when those policies were in effect. The Court of Appeals held:

> "[T]here is no 'accident' if an intentional act brings an unexpected result. That rule applies here to the pollution that resulted from the routine business practices of M&B.
>
> "* * * * *
>
> "[The] evidence shows intentional practices in the regular course of business, not an 'accident.' * * * M&B failed to show that there were issues of fact as to whether there were 'accidental spills' at either site. The trial court did not err in granting summary judgment * * * on the issue of 'accident.' " 126 Or App at 705-06.

For the following reasons, we reverse that holding of the Court of Appeals.

The relevant provisions of the Hartford, National Fire, and St. Paul policies provide:

> "[The insurer agrees t]o Pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law, or assumed by him under contract as defined in the policy for damages because of injuries to or destruction of property, including loss of use thereof, *caused by accident* * * *." (Emphasis added.)

The insurers urge this court to adopt the "regular-course-of-business" test articulated by the Court of Appeals or, alternatively, a test that places a temporal limitation on the definition of the word "accident." They argue that the term "accident" as it is used in those policies "means a sudden happening, not only unexpected, but one referable to a definite time." The insurers assert that events that result from "the regular course of business" cannot be accidents, because the means that produced those events were deliberate and continuous business practices.

M&B contends that the term "accident" as used in those policies contains neither a temporal element nor a

"means"-based limitation. M&B asserts that an "accident" is any event that results in unexpected, or unforeseen, consequences.

Our analysis begins with the wording of the policies. The word "accident" is not defined in the policies, however.

Hartford argues that an endorsement to the 1950-51 policy provides some insight as to the meaning of the word "accident" in that policy. That endorsement reads in part:

> "The words 'caused by accident' are deleted from Insuring Agreement 1—Coverages A and B—Bodily Injury Liability of the policy. Insofar as concerns bodily injury liability only, the word 'occurrence' is substituted for the word 'accident' wherever the latter appears in the policy."

"Occurrence" was not defined.

Hartford argues that that endorsement draws a distinction between an "accident" and an "occurrence" that supports its reading of the pertinent part of the policy. However, the endorsement, by its own terms, is limited to those portions of the policy that cover "bodily injury." That coverage is not at issue.

We conclude that the wording of the policies does not resolve the issue. We next consider the ordinary meaning of "accident."

The word "accident" commonly means, as pertinent:

> "1a : an event or condition occurring by chance or arising from unknown or remote causes * * * b : lack of intention * * * 2a : a * * * sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result * * * c : an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but from the consequences of which he may be entitled to some legal relief." *Webster's* at 11.

That definition is broad enough to cover the proposed definitions of both sides.

However, prior cases from this court provide guidance as to the meaning of "accident." In *Finley v. Prudential*

*Ins. Co.*, 236 Or 235, 238, 388 P2d 21 (1963), this court was required to interpret the word "accident" as it applied to an insurance claim for "accidental bodily injury." The court stated that "the word 'accident' denotes an incident or occurrence that happened by chance, without design and contrary to intention and expectation." *Id.* at 245.

In *Ramco, Inc. v. Pacific Ins.*, 249 Or 666, 667, 439 P2d 1002 (1968), the insured sought to recover for property damage on a third-party GCL policy. The insured had made defective heaters and had sold them to a motel. The heaters caused extensive damage to the motel. The insured's policy contained a caused-by-accident clause that is identical to the clause in the Hartford, National Fire, and St. Paul policies. *Id.* at 668 n 1. This court held that the policy provided coverage to the insured. *Id.* at 674. Although the court's holding in *Ramco* was limited to interpreting the clause with reference to a products liability claim, the court stated that the definition of "accident" given in *Finley* generally would apply. *See Ramco*, 249 Or at 669 ("Generally, the definition of the word 'accident' in our decision in *Finley v. Prudential Ins. Co.*, would include the events described in this action." (citation omitted)).

In the present case, the Court of Appeals concluded that "there is no 'accident' if an intentional act brings an unexpected result." 126 Or App at 705. The court reached that conclusion by relying on a portion of the *Finley* opinion that drew a distinction between unintentional *results* and unintentional *means. Ibid. See Finley*, 236 Or at 245 (defining an "accident" as something that is unintended, and then stating that the "court is committed by *Buckles v. Continental Casualty Co.*, [197 Or 128, 251 P2d 476, 252 P2d 184 (1953),] to the rule which distinguishes between accidental means and accidental results from intended means"). Under that rule, unintended events that result from intentional acts "where no mischance, slip, or mishap occurs" are not accidental, whereas unintended events that result from unintentional acts are accidental.

The Court of Appeals' reliance on the means/results distinction was error. In *Botts v. Hartford Acc. & Indem. Co.*,

284 Or 95, 100, 585 P2d 657 (1978), this court decided to "lay the distinction to rest." The court stated:

> "We interpret insurance policies according to what we perceive to be the understanding of the ordinary purchaser of insurance. We have previously expressed doubts as to whether the ordinary purchaser would expect the concept of 'accident' to have a different meaning depending upon whether the policy purports to require accidental means or accidental results. We are convinced that no distinction would be expected.
>
> "* * * The insurance company may, of course, insert in its policy any definition of 'accident' it chooses but in the absence of doing so, it must accept the common understanding of the term by the ordinary member of the purchasing public." *Id.* at 100-01 (citations omitted).

In *Finley*, this court defined accident, as that word is understood by an ordinary purchaser of insurance. In *Ramco*, the court applied the *Finley* definition of "accident" to a third-party GCL policy for property damage. In *Botts*, the court eliminated the means/results distinction, but did not modify the court's prior discussion of the common meaning of "accident" nor the applicability of that common meaning to a third-party GCL caused-by-accident policy.

We recognize that *Finley*, *Ramco*, and *Botts* all were decided after the expiration of the policies under discussion (1949-62). Nonetheless, the court intended those cases to portray the common understanding of the term "accident" by an ordinary purchaser of insurance. For that reason, we rely on them here. Based on our precedents, an "accident" is an "incident or occurrence that happened by chance, without design and contrary to intention and expectation." *Finley*, 236 Or at 245. We so interpret the term "accident" in the caused-by-accident policies in this case.

■    M&B seeks indemnification for investigation and remediation of soil, ground water, and surface water contamination that caused damage to the property of others. M&B presented evidence of the following damage at the Portland plant:

- Between 1949 and 1962, contaminants were spilled as a result of "equipment failures such as ruptured pipes, lines and broken or leaky valves."

- As part of M&B's operations, preservatives leaked or spilled onto the ground, although M&B tried to avoid such leaks and spills "to assur[e] that product was not wasted and that there was a clean and safe work place."

- Between 1949 and 1985, there were at least 25 spills of preservatives, ranging from a few gallons to 3,000 gallons, "that occurred when a storage tank overflowed as a result of preservatives being accidentally pumped back to a tank that did not contain sufficient capacity for the solution."

- On July 11, 1956, 3,657 gallons of creosote spilled onto the ground because of a defective loading valve on a tank car.

- During a labor dispute in 1949 or 1950, someone deliberately opened a flange bolt on a large storage tank, and 47,000 gallons of creosote spilled out as a result.

M&B presented evidence that contamination from the 1950 and 1956 spills reached the groundwater within a year after the spills occurred. M&B presented evidence that that contamination "remain[s] a part of the existing plume of groundwater contamination associated with the * * * Portland site." M&B presented evidence that contaminants from the other leaks and spills "would inevitably reach the groundwater and would serve as an additional source of groundwater pollution."

M&B presented evidence that similar leaks, ruptures, and spills occurred at the Stockton site. M&B also presented evidence that surface impoundments were in use at the Stockton site when the Hartford, National Fire, and St. Paul policies were in effect. M&B presented evidence that contaminants reached the groundwater at the Stockton site within a year after M&B began to use the impoundments and that those contaminants "remain[ ] a part of the existing plume of groundwater contamination."

The above-described events all were "caused by accident" as that term is used in the pertinent policies. Evidence in the summary judgment record supports M&B's argument

that the spills, ruptures, and leaks were unintentional. The same holds true for the environmental harm that resulted from the spills, leaks, and ruptures, as well as for the use of the surface impoundments. M&B presented evidence that it was unaware that leaching of contaminants into the groundwater would occur. Accordingly, there is evidence that the groundwater and soil contaminations were unintended events.

### 2. *The Hickman Affidavit*

The insurers argue that certain facts contained in an affidavit are inadmissible under ORCP 47 D.[8] From that premise, the insurers conclude that there is no issue of fact as to whether a 47,000-gallon creosote spill occurred in 1949 or 1950. The Court of Appeals agreed with that argument and conclusion. 126 Or App at 705-06.

The affidavit at issue was made by Doane Hickman, superintendent of the Portland plant when the spill occurred. Hickman avers that he was the superintendent of the Portland plant from 1946 to 1958 and that he "had the opportunity to oversee all operations in the wood treating process." The affidavit also states:

"During a labor dispute in the early 1950's at the Portland plant, someone deliberately opened a flange bolt on a large storage tank. This resulted in a spill of many thousands of gallons of preservative."

The insurers argue that those statements are insufficient to establish that Hickman had personal knowledge of such a spill.

We need not decide whether Hickman's statements about the spill are admissible, because there is other evidence in the record that would establish that the creosote spill did occur. For example, M&B submitted an interoffice memorandum and a proof- of-loss claim form discussing the

---

[8] ORCP 47 D provides in part:

"[A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

same creosote spill. The insurers did not object to the admission of those documents in the trial court, and they do not now argue that the documents are inadmissible. The Court of Appeals erred when it concluded that there was no triable issue of fact as to whether the creosote spill occurred.

## C. The "Pollution-Exclusion" Policies

As discussed above, after 1970 M&B purchased a series of GCL policies and excess liability policies with "pollution exclusions." The trial court granted summary judgment in favor of those insurers with policies containing "pollution exclusions," and the Court of Appeals affirmed. 126 Or App at 706-07.

### 1. The US Fire Policy

The pollution exclusion in the US Fire (1970-73) excess liability policy differs from the pollution exclusions in the other policies. As previously noted, the US Fire policy covered "damages because of injury to or destruction of tangible property including consequential loss resulting therefrom caused by an occurrence." The pollution exclusion in that policy provided:

"This policy shall not apply * * * to liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by an occurrence.

"For the purpose of this endorsement * * *

" 'Occurrence' means a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

The US Fire policy thus exempts from coverage contamination or pollution that damages property, if the damage is "caused by an occurrence." As a preliminary matter, for the exclusion to apply here, there must be *property damage* that *resulted* from *contamination or pollution* of land or water. That fact is not at issue in this case. M&B and US Fire agree that third-party *property damage* took place and that it is the

*result* of the leaching of *contaminants* into the groundwater and subsurface soil—"contamination" or "pollution" of land or water as those words are used in the exclusion. The remaining issue is whether that damage was "caused by an occurrence."

In the US Fire policy's pollution exclusion, an "occurrence" means "a continuous or repeated exposure to conditions which unexpectedly and unintentionally cause[ ] injury to * * * property during the policy period." Accordingly, the exemption applies if there is:

(1)  a continuous or repeated exposure to conditions,

(2)  which unexpectedly and unintentionally causes

(3)  injury to property

(4)  during the policy period.

M&B has pleaded and argued that there was property damage during the policy period. At this stage in the proceedings, US Fire accepts those arguments. Thus, the third and fourth factors in the definition of "occurrence" in this pollution exclusion are satisfied.

From the record on summary judgment, there can be no dispute that the first element also has been satisfied. By the terms of the policy, for the first element to be met, the property damage must result from "conditions" that are maintained or reproduced over time. During the policy period, most of the damage caused at the M&B facilities resulted from leaching at the "surface impoundments." The evidence in the summary judgment record shows that, at both sites, contaminants were continuously and repeatedly placed in those impoundments. Thus, the harm caused by leaching from the surface impoundments was the result of a continuous or repeated exposure to the conditions present in the surface impoundments.

M&B also presented evidence that, at both facilities, there were spills that resulted from repeated equipment failures. M&B also presented evidence that there were at least 25 spills that occurred when storage tanks were overfilled. Thus, any groundwater or subsurface soil contamination that

resulted from those spills also resulted from "repeated exposure to conditions."[9]

Finally, as to the remaining element, M&B argues that the leaching of contaminants into the groundwater was unexpected and unintended. US Fire accepts that characterization.

As our discussion shows, the "contamination or pollution of land, water, air or real or personal property * * * or damages resulting therefrom" for which M&B seeks coverage was an "occurrence" as that term is defined in the US Fire pollution exclusion. Therefore, the exclusion applies.

■ M&B does not dispute any of the foregoing analysis. Rather, M&B argues that the pollution exclusion is confusing, because it contains a definition of "occurrence" that is different than the definition of "occurrence" contained in the body of the policy.[10] M&B then asserts:

> "While it is the insurer's burden to draft exclusions that are clear, the use of conflicting definitions of 'occurrence' renders the provisions virtually unintelligible. The ordinary purchaser of insurance would have considerable difficulty in discerning what risks are covered and what are excluded. The insurer should not be permitted to invoke this inherently ambiguous exclusion to deny coverage."

We disagree with that argument. The policy, by its own terms, contains two different definitions of "occurrence." The first definition applies to the policy generally. The second, different definition applies only "to liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom." M&B does not assert that the scope of that phrase is unclear,

---

[9] Only two polluting or contaminating events disclosed in the summary judgment record—the 1956 spill that resulted from a defective loading valve and the 1949 or 1950 creosote spill that occurred during a labor dispute—were not the result of "continuous or repeated exposure to conditions." However, both of those events (and the leaching that followed) occurred more than a decade before the US Fire policy was in effect and, therefore, are not covered by that policy.

[10] The body of the policy defines an "occurrence" as "either an accident * * * or a continuous or repeated exposure to conditions." The pollution exclusion defines "occurrence" as "a continuous or repeated exposure to conditions," but does not include an "accident."

and we do not find it so. The pollution exclusion is a self-contained, complete unit. An ordinary purchaser of insurance would understand that the addition to an insurance policy, by endorsement, of an "exclusion" that explicitly defines the class of events covered, under specified circumstances, affects coverage. M&B's argument to the contrary is unconvincing.

The trial court did not err when it granted summary judgment to US Fire. For the reasons stated above, the Court of Appeals did not err when it affirmed that ruling.

2. *The National Continental, Consolidated American, and Gulf Policies*

The National Continental (1968-75), Consolidated American (1975-85), and Gulf (1973-76) policies all contained identical "pollution exclusions." Those policies provided in part:

> "[T]his insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*" (Emphasis added.)

Under the terms of those exclusions, only a "sudden and accidental" "discharge, dispersal, release or escape" is covered under the policy.

We note, first, that the emphasized clause of the "pollution exclusion" refers only to "discharge[s], dispersal[s], release[s] or escape[s]" that are "sudden and accidental." No "sudden and accidental" limitation is placed on the property damage "arising out of" such events. In other words, under the exclusion, if a "discharge, dispersal, release or escape" is "sudden and accidental," the resulting property damage need not be "sudden and accidental" for the exception to the exclusion to apply and for coverage to exist.

The insurers argue that the phrase "sudden and accidental" is unambiguous. Under their reading of the policies, "sudden" has "a temporal meaning, connoting an abruptness and short duration that precludes coverage for

the ongoing, repeated, long term activities that caused innumerable discharges." Moreover, an "accidental" event must be an *event* that is unintended; an accidental event cannot be something that is "allowed to occur as part of [M&B]'s regular business practices for more than four decades."

M&B argues that the phrase "sudden and accidental" means simply "unintended and unexpected." In support of that argument, M&B relies on decisions from other jurisdictions interpreting the same pollution exclusion, on treatises, on law review articles, and on statements made by insurance lobbyists in other jurisdictions concerning the phrase "sudden and accidental."

As stated above, our goal in interpreting an insurance policy is to ascertain the intent of the parties when they contracted. We start with the words of the policies.

"Sudden" is not defined in the policies. "Sudden" commonly means, as pertinent:

> "1a : happening without previous notice or with very brief notice : coming or occurring unexpectedly : not foreseen or prepared for * * * b : changing angle or character all at once : PRECIPITOUS * * * : ABRUPT * * * c : come upon or met with unexpectedly 2a : characterized by or manifesting hastiness : RASH, HEADLONG." *Webster's* at 2284.

Thus, "sudden" *may* have, but *need not* always have, a temporal element.

M&B argues that "sudden" commonly is understood to *lack* a temporal element. *See, e.g., Plasker v. Fazio*, 259 Or 171, 180, 485 P2d 1075 (1971) (interpreting the word "suddenly" as used in a statute to mean "unexpectedly"). M&B argues that, because the insurers did not anticipate the groundwater and soil contamination at the Portland and Stockton plants, that damage was sudden.

M&B also argues that that contamination was "accidental." "Accidental" was not defined in the policies, either. It commonly means, as pertinent:

> "2 : occurring sometimes with unfortunate results by chance alone : a: UNPREDICTABLE : proceeding from an unrecognized principle, from an uncommon operation of a

known principle, or from a deviation from normal." *Webster's* at 11.

The dictionary goes on to state that, "when it is used in reference to events, ACCIDENTAL may stress lack of intent." *Ibid.* In other words, an accidental event may be an unintentional, or chance, event.

If the foregoing readings of the words "sudden" and "accidental" are given effect, the phrase "sudden and accidental" could be synonymous with the phrase "unintended and unexpected." The insurers argue that such a reading of the phrase "sudden and accidental" renders that phrase redundant, because an unintended event always is an unexpected event. That is not necessarily so. Not every unintended event (or result) necessarily is unexpected.[11]

M&B's argument that the phrase "sudden and accidental" does not contain a temporal element, or at least is ambiguous as to whether it contains a temporal element, is strengthened by another factor. At the time that M&B purchased the policies with the pollution exclusions, courts had interpreted the word "sudden" to mean "unexpected" in the business insurance context. Before the phrase "sudden and accidental" was incorporated into pollution exclusions, that phrase had been used in numerous "machinery and boiler" policies. It had been interpreted routinely to mean "unintended and unexpected." *See, e.g., New England Gas & E. Ass'n v. Ocean Acc. & Guar. Corp.*, 330 Mass 640, 116 NE2d 671, 680 (1953) (interpreting the word "sudden" as used in the phrase "sudden and accidental" in a machine and boiler policy and "giv[ing] to the term sudden its primary meaning according to the lexicographers as a happening without previous notice or with very brief notice, or as something coming or occurring unexpectedly, unforeseen, or unprepared for");

---

[11] A simple example should suffice. A world champion marathon runner enters the Olympics. In the past decade, no competitor has come close to beating her in any race. She is favored to win. She runs the race as hard as she can. As she approaches the finish line, she is in first place. Then, in the last 100 yards, she is overtaken by another runner. No matter how hard the favorite tries, she cannot pass her competitor. Based on her past experience, and on her knowledge of the competition, that marathoner *expected* to win the race. She trained intensively and ran as hard as she could, because she *intended* to win the race. Her loss was both unexpected *and* unintended.

*Anderson & Middleton Lbr. Co. v. Lumbermen's M.C. Co.*, 53 Wash 2d 404, 333 P2d 938, 941 (1959) (interpreting the word "sudden" as used in the phrase "sudden and accidental" in a machine and boiler policy and stating that the "primary meaning" of "sudden," "in common usage, is not 'instantaneous' but rather 'unforeseen and unexpected'"). *See also* George J. Couch, et al., 11 *Couch Cyclopedia of Insurance Law*, § 42:383 (2d ed 1963) (" 'sudden' should be given its primary meaning as a happening without previous notice, or as something coming or occurring unexpectedly, as unforeseen or unprepared for * * *; 'sudden' is not to be construed as synonymous with instantaneous" (footnotes omitted)).[12] In those policies, "sudden" was understood as *lacking* a temporal element. When the insurers placed the "sudden and accidental" clause in the pollution exclusions, that term already had been interpreted to mean "unintended and unexpected." *See* John Alan Appleman and Jean Appleman, 13 *Insurance Law and Practice*, § 7404 (1976) ("[I]f an insurance company continues to employ clauses which have been construed unfavorably to its contention by the courts, it may well be considered to have issued the policy with that construction placed on it and cannot be heard to insist that the loss is not covered. The very fact that a number of courts have reached conflicting conclusions as to the interpretation of a certain provision is frequently considered evidence of ambiguity." (footnotes omitted)). *See also Jones v. Ins. Co. of North America*, 264 Or 276, 282 n 1, 504 P2d 130 (1972) ("conflicting judicial decisions as to the proper construction of a clause in an insurance policy are evidence, although not necessarily conclusive, that the clause is ambiguous").

As our foregoing discussion shows, the word "sudden" as it is used in the pollution exclusions is susceptible to differing interpretations. This court's prior case law and contemporaneous understandings of the phrase "sudden and accidental" lend support to M&B's reading of that phrase. The policies themselves do not resolve the ambiguity.

---

[12] The current edition of *Couch Cyclopedia of Insurance Law* contains the same statement. George J. Couch, et al., 10A *Couch Cyclopedia of Insurance Law*, § 42: 396 (2d ed 1982).

M&B, the insurers, and numerous *amici curiae* point to two additional types of materials to support their competing interpretations of the pollution exclusion: (1) case law from other jurisdictions, interpreting the same pollution exclusion; and (2) statements by representatives of the insurance industry to agencies in various states, concerning the meaning of the pollution exclusion. Assuming that those materials are relevant and admissible, they lend support to *both* sides' arguments as to the meaning of the pollution exclusion and thereby illustrate that the pollution exclusion is susceptible to more than one reasonable interpretation. Accordingly, they simply help to demonstrate that the exclusion is ambiguous.

Under the methodology described above, 324 Or at 192-93, we conclude that the pollution exclusion is ambiguous. Accordingly, we construe the policy against the drafter. We hold that the pollution exclusions contained in the National Continental (1968-75), Consolidated American (1975-85), and Gulf (1973-76) policies do not apply to discharges, dispersals, releases, or escapes that are "unintended and unexpected."

M&B presented evidence that contaminants from the surface impoundments leached into the groundwater and subsurface soil during the effective periods of the pertinent policies. M&B presented additional evidence that leaks, ruptures, and spills at the plant occurred during that time and that those events also affected the groundwater and subsurface soils. M&B presented evidence that the contamination that resulted from those events—the discharge, dispersal, release or escape of the contaminants—was unexpected and unintended.

The trial court erred when it granted summary judgment in favor of National Continental, Continental Casualty, and Gulf on the "pollution-exclusion" issue. The Court of Appeals erred when it affirmed that ruling.

## V. CONCLUSION

The trial court erred when it granted summary judgment in favor of St. Paul, Continental Casualty, National Continental, and Lloyds, on the trigger-of-coverage issue.

The trial court erred when it granted summary judgment in favor of Hartford, National Fire, and St. Paul, on the caused-by-accident issue.

The trial court erred when it granted summary judgment in favor of National Continental, Consolidated American, and Gulf, on the pollution-exclusion issue.

The trial court did not err when it granted summary judgment in favor of US Fire.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed as to United States Fire Insurance Company and reversed as to all other insurers identified in the court's opinion. The case is remanded to the circuit court for further proceedings.